Smith *v.* Gallagher, Appellant.
Leonard Petition.
White *v.* Gold.
Crumlish Petition.

552

554

Argued September 12, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and KEIM, JJ.

*David Berger,* City Solicitor, for appellants.

*W. Wilson White,* in propria persona, and for *F. Hastings Griffin, Jr.,* intervening appellants.

*Herbert A. Fogel,* with him *David O. Maxwell,* for Republican Alliance, intervenor, in support of appellants.

*Louis Lipschitz,* for appellee.

*Thomas D. McBride,* with him *Herbert S. Levin,* for Democratic County Executive Committee, intervenor, in support of appellee.

*David Berger,* City Solicitor, for appellant.

*Robert M. Landis,* for appellee, F. Hastings Griffin, Jr.

*W. Wilson White,* petitioner, in propria persona.

*Edwin P. Rome,* Special Counsel, with him *James C. Crumlish, Jr.,* District Attorney, in propria persona, for petitioner.

*F. Hastings Griffin, Jr.,* with him *W. Wilson White,* in propria persona, for respondents.

OPINION BY MR. JUSTICE MUSMANNO, October 26, 1962:

Four cases are involved in this appeal and they all will be disposed of in one opinion. One has to do with an appeal from the Court of Common Pleas No. 6 of Philadelphia County, another is an appeal from an interlocutory rule and order of the Court of Quarter Sessions of Philadelphia County, a third is an application by W. Wilson White, Esq., to this Court for a writ of prohibition and mandamus directed to Court of Common Pleas No. 6, and the fourth is another application to this Court's original jurisdiction presented by James C. Crumlish, Jr., district attorney of Philadelphia County, seeking a writ of prohibition directed to Judge EUGENE V. ALESSANDRONI and W. Wilson White, Esq.

All these proceedings are predicated on certain actions taken in the Court of Quarter Sessions of Philadelphia County beginning in March, 1962 and running into September, 1962. Those actions lack legality and cannot be allowed to stand. An asserted "Special Grand Jury" was ordered, for which there is no warrant in law; an attorney was appointed as "Special Prosecutor," an office which does not exist; an investigation was directed without limitation as to subject matter or time, contrary to the most fundamental precepts of precision in the administration of the law; a constitutional officer, duly elected by the people of Philadelphia County, was displaced from office, with-

out due process; additional personnel was employed, supplemental quarters were rented, new facilities were obtained, all at the expense of the taxpayers when personnel, quarters and facilities for the contemplated action were already in existence.

The facts follow. On March 22, 1962, a petition addressed to the judges of the Court of Quarter Sessions of the Peace of the City and County of Philadelphia, signed by Robert L. Leonard and other "citizens, taxpayers and residents" of Philadelphia, was filed with the clerk of quarter sessions, averring widespread violations of law in the government of the City of Philadelphia and that the district attorney, James C. Crumlish, Jr., was unable or unwilling to cope with the situation. The petition prayed that the grand jury be instructed to investigate into the matters therein described.

The petition came into the hands of Judge GUERIN, assigned to Quarter Sessions Court No. 4 (Bail Arraignment Court), which court was charged with conducting all miscellaneous business coming before the Criminal Courts[1] of Philadelphia County for the month of March, 1962.

It is to be noted at the outset that pursuant to Article V, §8 of the Pennsylvania Constitution, the Board of Judges of Philadelphia County, made up of 21 judges, details for each succeeding month a court of common pleas (consisting of three judges) to the criminal court to conduct, supervise, direct and handle all matters pertaining to the grand jury which convenes in Room 653, City Hall, known as Quarter Sessions Court No. 1. Court of Common Pleas No. 7 was designated to that duty for the month of March. Within No. 7 itself, it was decided that President Judge

---

[1] For convenience, the phrase "Criminal Courts" is sometimes used instead of the long formal title: Courts of Oyer and Terminer, Quarter Sessions of the Peace and General Jail Delivery.

SLOANE would preside in Room 653 for the weeks beginning March 5th and March 12th and that Judge GLEESON would preside for the weeks beginning March 19th and March 26th. Thus Judge GLEESON was presiding in Room 653 from March 19th until the termination of the March term.

For a reason never explained, the petition of Robert Leonard et al. (hereinafter to be referred to as the Leonard petition), was not presented to Judge GLEESON but went to Judge GUERIN in Quarter Sessions Court No. 4, that division of the court, as above stated, which administers all miscellaneous business of the court. It is obvious that by no liberal construction of language can the summoning of a grand jury be regarded as a miscellaneous item. "Miscellaneous" connotes odds and ends of affairs: remnants and scraps, heterogeneous and promiscuous. In the classification of what is important, a grand jury investigation is not to be found in the heterogeneous and promiscuous scraps of a court's activities.

On March 30, 1962, Judge GUERIN ordered a hearing on the petition in Courtroom 646 for April 27, 1962. The record does not disclose how it came about that as Judge GUERIN[2] finished his term of service in criminal court the Leonard petition did not revert to Quarter Sessions Court No. 1, its logical depository, but instead came into the hands of Judge ALESSANDRONI, President Judge of Court of Common Pleas No. 5 who now succeeded Judge GUERIN in the Miscellaneous Division (Court No. 4) for the month of April. Among the incongruities in the history of this case, no light is shed on the inevitable query as to why Judge ALESSANDRONI, once he perused the Leonard petition, and, being thoroughly conversant with the division of duties and responsibilities in the criminal court, did

---

[2] It is not suggested that Judge GUERIN, able and conscientious judge, had any ulterior purpose in the actions here discussed.

not himself immediately refer the petition to Judge GRIFFITHS, who was ready to instruct the grand jury in Court No. 1 during the entire month of April.

On April 13, 1962, the District Attorney of Philadelphia County filed an answer to the Leonard petition in which he denied that he was unable or unwilling to meet the situation outlined in the petition. He also made factual averments in support of his assertion that he had been and was fully capable of performing properly the duties of his office.

On April 27, 1962, when the Leonard petition was argued before Judge ALESSANDRONI, Attorney Fogel, representing the Republican Alliance which had initiated the Leonard petition, stated that Judge ALESSANDRONI would not have jurisdiction over the petition in the event his term in the Court of Quarter Sessions expired before it was acted upon, and he recommended that Judge ALESSANDRONI enter into a concord with other judges to obtain authority to charge any grand jury which might be convened for the purpose of conducting an investigation. Judge ALESSANDRONI stated that that could not be done. The colloquy was as follows: "MR. FOGEL: The point, sir, is that Your Honor may come to a determination in the matter when Your Honor might not then be sitting in the Court of Quarter Sessions, and not being in the Court that has jurisdiction over the Grand Jury, I would like to make sure that there would be no objections interposed if Your Honor should determine that special instructions should be given and that Your Honor have jurisdiction and the power to convene a special Grand Jury so instructed. THE COURT: Mr. Fogel, I admire you for raising a question of that kind. However, *I don't see how that can be waived.*"[3]

Mr. Fogel commented: "I think it was done before Judge ALEXANDER as to that point." And then Judge

---

[3] All italics supplied unless otherwise indicated.

ALESSANDRONI, in the following language, definitively took himself out of the possibility of convening a grand jury: "THE COURT: Even if they agreed maybe on some other constitutional basis—in other words, a Grand Jury summoned by this Court, would have to be summoned within the jurisdiction of my term. *I would still have to be a Quarter Sessions Judge. However, my term ends the first Monday in May. I don't think I can extend my jurisdiction beyond that.*"

Judge ALESSANDRONI'S term as quarter sessions judge ended, as he himself stated it would, on the first Monday of May, and he returned to the court of common pleas. Before quitting the criminal court he had made no definitive decision on the Leonard petition and he did not pass it on to his successor in the miscellaneous branch of the court, as Judge GUERIN had bequeathed it to him. Nor did he make any effort to call it to the attention of Judge DOTY who was now presiding in Criminal Court No. 1 and who stood ready to charge the grand jury on all matters which required action. The month of May wended its accustomed way through the calendar and then came June which in due time melted into July, but during all this time the Leonard petition was ignored, neglected and unmentioned.

As indicated, Judge GRIFFITHS had charge of the grand jury in April, he was followed by Judge DOTY in May. Judge DOTY, in turn, was succeeded by Judge ULLMAN for the month of June and when Judge ULLMAN had completed his assignment Judge SPORKIN assumed command of the grand jury for July. It would have been a simple matter to refer the Leonard petition to any of these judges to determine the question of a grand jury investigation.

From March 22nd to July nothing happened on the Leonard petition, and in the meantime the cobwebs of inaction formed their inevitable film of obliteration

over form and substance. Undue passage of time nearly always works adversely in the ascertainment of truth. Where there is any controversy, truth is a ripe fruit which must be timely picked. After maturity passes, disintegration sets in. Memory fades, and what is worse, it often enters into the shadowland of guesswork, loss of focus and even unconscious distortion. In addition, deaths, translocations and other mutations also make holes in the fabric intended to reproduce in testimony what has occurred in fact.

Of course, some delays in law are inevitable but this was not the case here. The record does not offer the slightest explanation as to the reason for the inert lodgment of the Leonard petition from March until July 11, 1962. The only possible explanation for this inertness, consistent with adherence to judicial responsibility, is that the judge was in grave doubt as to whether there should be a grand jury investigation. Finally, on July 11th, under the heading of Quarter Sessions Court, March Session, 1962, Miscellaneous Docket No. 279, Judge ALESSANDRONI ordered what he called a "Special Grand Jury." But even then, another protracted procrastination intervened. The July grand jury, under the presidency of Judge SPORKIN, was in session, ready and prepared to take action, but the learned judge of Court of Common Pleas No. 5 ignored the established machinery of the court. He passed over Judge SPORKIN. Judge SPORKIN, in the grand jury courtroom, was followed by Judge HAGAN who was to conduct all grand jury business for the month of August. Judge ALESSANDRONI was indifferent to Judge HAGAN and the grand jury over which he presided and which, equally, was standing by for any special instructions throughout that month.

Judge ALESSANDRONI ordered a "Special Grand Jury" to be convened on September 5th which was five months after the Leonard petition had come into his

hands. In ordering a special grand jury investigation to begin in September he also declined to recognize Judge ALEXANDER who was presiding in the grand jury courtroom for that entire month.

This is all related not as censure, but to emphasize what can occur when the regular forms and procedure of government are not followed, and judges embark on independent ventures, sailing in ships without sails of authority, using engines devoid of constitutional power and employing a compass lacking decisional direction. All the judges mentioned in this case are jurists of wide experience and of the highest probity. Judge ALESSANDRONI, particularly, who granted the Leonard petition, is a veteran jurist of scholarly attainments whose judicial integrity is not questioned.[4] Orderly procedure in the Courts and the laying down of rules for guidance of future conduct in matters of this kind, however, require the narrative and observations which have been made and which may follow.

The history of what happened to the Leonard petition is needed not only as background in disposing of the issues here on appeal but it serves also as a reminder of the manner in which the business of the Criminal Courts of Philadelphia should *not* be conducted. Why the Board of Judges of Philadelphia County allowed the inordinate delays recounted, the entangling and thwarting of the schedules they themselves had set up in the criminal courts, we are not informed. But that the inertia, lack of coordination and absence of frank disclosure among judges which have been manifested in this entire proceeding bestows no

---

[4] The Court of Common Pleas No. 6, in its adjudication in the *Smith v. Gallagher* case, said: "Judge ALESSANDRONI needs no testimonial from us concerning his love for the law and the legal traditions which he cherishes. We need not vouch for his probity and integrity. We regard him affectionately and warmly as the dean of the Philadelphia judiciary."

credit on the whole administration of the criminal courts in Philadelphia is written too plainly on the gray and ancient walls of City Hall.

We now come to the question as to whether the order of July 11, 1962, summoning a grand jury, carried the imprimatur of the court of quarter sessions. Judge ALESSANDRONI was not sitting in that court in July. His term there having expired the first Monday of May, he had returned to his regular post as President Judge of Court of Common Pleas No. 5. In fact, the reverse side of the backing sheet of the order in which he called for a grand jury investigation bears the printed designation: "COURT OF COMMON PLEAS NO. 5 IN AND FOR THE COUNTY OF PHILADELPHIA."

The fact that he had shed his robe in criminal court would not of itself disqualify him from acting on criminal subjects. When a common pleas judge completes his term in criminal court it not infrequently happens that he must attend to unfinished matters and these he may and must dispose of even after he has reverted to his common pleas court status.[5] However, the ordering of a grand jury investigation could not possibly qualify under the heading of unfinished business. We have seen that the Leonard petition was not presented to Judge ALESSANDRONI in the first instance, we have observed how on April 27th he stated that he could not summon a grand jury unless he was actually in criminal court, and we have noted that he could have passed the petition on to the judge who succeeded him in criminal court as he had inherited it from his predecessor.

What was being sought in the Leonard petition was not in Judge ALESSANDRONI'S competence alone, if, indeed, it was within his competence at all. Since a grand jury investigation could not, as already stated,

---

[5] *Shenker v. Harr*, 332 Pa. 382.

in any view of the matter, be regarded as unfinished business and since Judge ALESSANDRONI was not sitting in criminal court in July, the order he signed on the eleventh day of that month was of no more binding effect than if he were sitting in Delaware.

A judge must be assigned to the court over which he purports to preside. Judge ALESSANDRONI in effect commandeered the grand jury courtroom when he took possession of the Leonard petition, but he was not assigned to the grand jury room. If he could assume jurisdiction, when not assigned thereto, over grand jury matters, then any judge in the criminal court could take similar jurisdiction. If petitions or other applications for judicial action do not go to the judge designated to handle the subject matter of the petition but may, in billiard-ball fashion, make the rounds of the courts, haphazardly striking and missing jurisdiction until the final destination and disposition becomes a matter of chance, then the mists of potential chaos will hover constantly over the courthouse. The Pennsylvania Constitution specifically aimed at dissipating such mists in the workshop of justice through the operation of Article V, §8, which says that judges shall be detailed "to hold the courts of oyer and terminer and the courts of quarter sessions" "*in such manner as may be directed by law.*"

Even if the call of a special grand jury could have been justified in law, it did not follow that Judge ALESSANDRONI was the judge to preside over it. As pointed out by Justice COHEN in his concurring opinion in *Hamilton Appeal,* 407 Pa. 366, 373, the authority to charge a grand jury, in a situation like the one at bar, could only come through the approval of the assignment judge and the individual grand jury judges sitting during the months involved. No such approval was even remotely suggested in the case before us.

It should be stated here that much of the confusion, complications and complexities in this case did not result from the error of any single judge but was caused by the strange composition of the Court of Common Pleas of Philadelphia County. Instead of one integrated court with a president judge over all, the court is made up of seven separate courts, each comprising three judges with a president judge of its own. Each of these seven courts exercises a certain amount of autonomy which separates it from the other six, as much as if it were in another county. Judges who are not president judges feel a certain inferiority toward all the seven president judges so that the president judges may be led astray simply because of the lack of free and candid discussion which should characterize the entire bench of the county. This is not the place to discuss reorganization of the courts of Philadelphia County, but it is to be hoped that proper constitutional action will be taken to dissolve the seven individual courts of Philadelphia and amalgamate them into one court of common pleas, with one president judge, who will have authority to assign the judges to the various departments of work and to schedule the court's business so as to remove all overlapping or collision of effort and endeavor, creating in the end a homogeneous, close-knit, harmonious-working court.

Had there been one president judge having administrative direction over all judges assignable to the criminal courts of Philadelphia County when the Leonard petition was filed, he would have decided, after consultation, of course, with the whole body of judges, whether he should call upon the Attorney General of the Commonwealth, under the Act of April 9, 1929, P. L. 177 (Administrative Code of 1929, P. L. 177, §907, 71 P.S. §297), which provides, inter alia: "When the president judge, in the district having jurisdiction of any criminal proceedings, before any court of oyer

and terminer, general jail delivery, or quarter sessions, in this Commonwealth, shall request the Attorney General to do so, in writing, setting forth that, in his judgment, the case is a proper one for the Commonwealth's intervention, the Attorney General is hereby authorized and empowered to retain and employ a special attorney or attorneys, as he may deem necessary, properly to represent the Commonwealth in such proceedings, and to investigate charges, and prosecute the alleged offenders against the law. Any attorney, so retained and employed, shall supersede the district attorney of the county in which the case or cases may arise, and shall investigate, prepare, and bring to trial the case or cases to which he may be assigned."

The lack of a single coordinating president judge in the Philadelphia district, however, did not suspend the applicability to Philadelphia of the quoted Act. The duty still devolved on Judge ALESSANDRONI to take up with the other judges of the court the question as to whether, under the circumstances presented to him, the Attorney General should be requested to supersede the district attorney. Instead of considering this definitive procedure, Judge ALESSANDRONI acted on his own volition and displaced the district attorney. A displacement of this character, even if only partial and temporary, is a serious and solemn matter. The learned judge treated it with a casualness which amounted almost to unconcern. The petitioners had charged the district attorney with misconduct and the district attorney had denied such misconduct, declaring under oath that he had "taken legal steps necessary to vigorously investigate the matter and prosecute any proven wrongdoers." He asserted "that the usual machinery for investigation and prosecution of crimes is operating efficiently and vigorously." If these assertions actually represented fact, there could not be any need for the action ordered by Judge ALESSANDRONI.

On April 26, 1962, the district attorney moved the court of quarter sessions to dismiss the Leonard petition, because the petitioners had "failed to establish that the public interest would suffer from the application and pursuit of the ordinary forms and procedures of law or that there exists in Philadelphia an emergency shaking the social fabric, or causing terror and dismay among the citizens, or the demoralization of public security."

These were assertions of substance made by an officer of the court. Instead of summarily dismissing them, the judge should have opened the door of inquiry, but he did not even raise a window; he made no effort to ascertain bilaterally whether the averments of the district attorney in his answer and motion to dismiss represented fact or not. With a few strokes of the pen he disposed of the whole serious situation by writing: "We accordingly dismiss the answer and motion without further comment." Since his pen had not addressed itself at all to the district attorney's averments, the "further" was superfluous language.

Of course, it is abundantly clear that in refusing to consider the district attorney's answer, the learned judge permitted himself an arbitrary exercise of judicial power. When he treated with aloofness the provisions of the Act of 1929 (supra), he abused his discretion. When he appointed a "Special Prosecutor," he attempted the impossible because he was making an appointment to a phantom office. We will consider later the matter of the "Special Prosecutor," and take up now the main issue in the case, namely, whether the court was warranted in summoning what it called a "Special Grand Jury."

The learned judge in his opinion did not cite one statute, quote one authority, or point to one decision which authorized him to direct the summoning of a

special grand jury.[6] A clarification must be made at once as to the meaning of a Special Grand Jury as contradistinguished from a Regular Grand Jury, because the terms have confusedly and almost inexcusably been used interchangeably. A Special Grand Jury is one that is chosen *specially* to investigate specially into certain conditions, and then make recommendations. It has no other purpose than this. A Regular Grand Jury (although it is usually simply called a grand jury) is one which is convened in the normal course of court business to receive complaints and accusations and find bills of indictment where they are satisfied a trial ought to be had. Such a grand jury, of course, is also available for the purpose of conducting investigations under special instructions from the court. In Philadelphia County a regular grand jury is assembled the first Monday of each month throughout the year.

The confusion between a Special Grand Jury and a Regular Grand Jury conducting a special investigation has produced a terminological melange to which, unfortunately, even judges have contributed. Lamentably, even in the State Reports, the phrase "Special Grand Jury" is occasionally used when the writer really has in mind a Regular Grand Jury conducting a special investigation.

There is no provision in the law for a special grand jury in Philadelphia County. The Act of March 13, 1867, P. L. 420, §2 (17 P.S. §472) specifies that there shall be monthly sessions of the Quarter Sessions Court in Philadelphia County. Section 2 reads: "The said courts shall, before the commencement of each term, as hereby established issue a venire, *for the summoning of twenty-four residents of said city and county, to*

---

[6] The reference to *Philadelphia County Grand Jury Investigation Case*, 347 Pa. 316, was unauthoritative. That case involved a proposed investigation by a *regular grand jury*, which, incidentally, was prohibited by this Court.

*serve as grand jurors;* and one or more venires for the summoning of petit jurors, shall be issued before or during said term; the number of petit jurors, so to be summoned, and the time they are to serve, to be determined by said court, when said venire or venires shall be ordered."

It will be particularly noted here that while there may be more than one venire of petit jurors summoned in any given month, *the summoning of grand jurors is limited to one venire per month.* If the action of the lower court were to be upheld it would mean an invitation to chaos, for, if one judge can issue a special venire, so can every other judge. With eight or nine judges continually sitting in the criminal courts of Philadelphia it would not take much visualization to picture the turmoil and disorder which would engulf the courthouse with a large population of grand jurors investigating every subject which might pique the interest of the individual judges. And if every judge in Philadelphia County may issue a special venire, what would prevent the individual judges throughout the State from doing likewise? (There are 197 nisi prius judges in Pennsylvania.)

On August 16, 1962, the City Council of Philadelphia, accepting Judge ALESSANDRONI'S orders as binding on it, enacted, and the Mayor approved, an ordinance appropriating $112,000 (with more to be appropriated later) to meet the expenses of the ordered grand jury investigation.

On August 21st Beatrice M. Smith, a taxpayer of Philadelphia, through her attorney Louis Lipschitz, Esq., filed a complaint in equity, in the Court of Common Pleas and of the Quarter Sessions Court of Philadelphia County against Francis A. Lalley, Finance Director; Alexander Hemphill, Controller; and Philip P. Poorman, Treasurer, all of the City of Philadelphia,[7]

---

[7] Philadelphia Home Rule Charter, §§6-106; 6-400.

praying that the court restrain them from expending any moneys appropriated by the City Council as above indicated because, the complaint asserted, the ordering of a special grand jury and the appointment of a special prosecutor was contrary to law.

On August 29th W. Wilson White, the named Special Prosecutor, petitioned this Court to issue a writ of prohibition or mandamus ordering the Court of Common Pleas No. 6, which now had before it for consideration the suit in equity filed by Beatrice M. Smith, to cease consideration of the named suit or, in the alternative, to transfer the case to Judge ALESSANDRONI. Argument on this petition was presented by City Solicitor Berger, Attorney White and Attorney Lipschitz before Justice JONES sitting in night special session in Wilkes-Barre. On August 30th the petition was denied.

On August 30th, Court of Common Pleas No. 6, made up of President Judge GOLD and Judges KELLEY and BLANC heard argument on Miss Smith's application for an injunction against Philadelphia's enumerated fiscal officers.

On September 5th, Court of Common Pleas No. 6 filed its adjudication in the *Smith* action stating that orders convening the special grand jury and appointing the Special Prosecutor were contrary to law and therefore null and void.[8] It entered a decree enjoining the defendants from expending any sums in connection with the ordered special grand jury investigation.

The City Solicitor of Philadelphia, David Berger, in order to obtain a definitive decision on the matters in issue, filed in behalf of the City of Philadelphia, an appeal to this Court from the decree entered by the

---

[8] The Court found that Judge ALESSANDRONI was within his jurisdiction in issuing the order of July 11th, but that the order itself was illegal. This Court reverses the first finding and affirms the second.

Court of Common Pleas No. 6. The Republican Alliance, represented by Attorney Fogel, and the purported Special Prosecutor, W. Wilson White, and his assistant, F. Hastings Griffin, representing themselves, intervened as party appellants. The Democratic County Executive Committee of Philadelphia, represented by Attorney Herbert S. Levin and Former Justice Thomas D. McBride, petitioned this Court for, and was granted permission to, leave to file briefs and make oral argument, in the appeal.

On September 6th, the District Attorney of Philadelphia, James C. Crumlish, Jr., having for his special counsel, Attorney Edwin P. Rome, filed in this Court a petition praying that we issue a writ directed to Judge ALESSANDRONI to prohibit W. Wilson White from serving as Special Prosecutor pursuant to the order of appointment of July 18th.

The appeal from Court of Common Pleas No. 6 and the argument on the petition for a writ of prohibition were heard on September 12th.[9] The intervening appellants attacked the decision of Court of Common Pleas No. 6 on the ground first of jurisdiction and then on the merits. They argued that Miss Smith's action in the court of common pleas constituted a collateral attack on the decision of a court of equal jurisdiction and therefore could not be sustained.

We do not find that Miss Smith's action lacked legal vitality. Beatrice Smith had a direct, substantial interest in the subject in controversy. The purpose of her lawsuit was to determine whether moneys, part of which came from taxes she had paid, should be used to support an operation which she claimed was, in fact

---

[9] On the same day, argument was also heard on an appeal (to be discussed later) from an order of Judge ALESSANDRONI restraining the City Council of Philadelphia from conducting a hearing inquiring into the qualifications of F. Hastings Griffin, Jr., as Assistant Special Prosecutor.

and in law, not legal. There is precedent for a procedure in the court of common pleas to question the legality of an order issuing from the court of quarter sessions. In *Moskowitz's Registration Case,* 329 Pa. 183, the Registration Commission of Philadelphia struck off its registry the name of David Moskowitz because of a sentence of disfranchisement imposed on him in the court of quarter sessions. Moskowitz protested in common pleas court this action of the Registration Commission, contending that the sentence of the court of quarter sessions was illegal because it was imposed after the expiration of the term at which he had been convicted. This Court sustained his position, declaring that the controverted sentence was a mere nullity and, therefore, subject to attack in any Court passing upon the rights of Moskowitz involved in the sentence: "Such a judgment is entitled to no authority or respect, and is subject to impeachment in collateral proceedings at any time by one whose rights it purports to affect. In Camp v. Wood, 10 Watts 118, it was held that a void judgment of a justice of the peace could not be introduced to establish rights in a subsequent proceeding over the same property. And, in Simpson's Estate, 253 Pa. 217, 225, this Court said: '"When the jurisdiction does not exist, and usurpation takes its place, then all the acts of the tribunal are void 'and of none effect,' and may be so treated in any collateral proceeding . . . Where there is no jurisdiction there is no authority to pronounce judgment, and consequently a judgment so entered is so but in form and similitude, and has no substance, force, or authority.' " . . .' "[10]

---

[10] See also *Commonwealth v. Hall,* 291 Pa. 341; *Irwin Borough School District v. North Huntingdon School District,* 374 Pa. 135; *Wall v. Wall,* 123 Pa. 545; Act of June 16, 1836, P. L. 784, §13(V.), 17 P.S. §282.

It has been argued that the action of the Court of Common Pleas No. 6 was ineffective, lacking indispensable parties. The record would not substantiate this argument. It will be noted, however, and particularly, that regardless of the action of the court of common pleas, this Court, under its King's Bench powers, possesses the power to pass upon all orders issuing from any court in the Commonwealth. Chief Justice HORACE STERN, in the case of *Commonwealth v. Onda,* 376 Pa. 405, declared: "More than two centuries ago section XIII of the Act creating the Supreme Court of this Commonwealth (Act of May 22, 1722, 1 Sm. L. 131) provided that the court should 'minister justice to all persons, and exercise the jurisdictions and powers hereby granted concerning all and singular the premises according to law, as fully and amply, to all intents and purposes whatsoever, as the Justices of the Court of King's Bench, Common Pleas, and Exchequer, at Westminster, or any of them, may or can do.' Thus the power of superintendency over inferior tribunals became vested in this court from the very time of its creation." Sir William Blackstone explained that the jurisdiction of the Court of King's Bench "keeps all inferior jurisdictions within the bounds of their authority." (Book 3, ch. 4)

It has also been argued that since there was never a direct appeal from Judge ALESSANDRONI'S order of July 11th that that order is legal and is not the subject of attack. This is an incorrect appraisal of the law. An order which is illegal in its inception does not gain legality or validity because it is not appealed from. This Court has the power to strike down any illegal act of a lower Court regardless of antecedents. Justice BROWN, speaking for a unanimous Court, quoted with approval in *Schmuck v. Hartman,* 222 Pa. 190, 194, from *Gosline v. Place,* 32 Pa. 520: "The judicial authority of this court extends to the review and correc-

tion of all proceedings of all inferior courts, except where such review is expressly excluded by statute, in accordance with the constitution; and we may issue all sorts of process, and use and adopt all sorts of legal forms that are necessary to give effect to this supervisory authority."

But the intervening appellants say that Judge ALESSANDRONI did have the jurisdiction and the authority to order a special grand jury and appoint a special prosecutor. The oral and written arguments submitted in behalf of this thesis, however, lack conviction or even persuasion. They speak vaguely of inherent authority, common law jurisdiction and traditional powers. One sentence in the brief of Attorneys F. Hastings Griffin and W. Wilson White illustrates the nebulosity of the contention, namely, "He [Judge ALESSANDRONI] convened a special grand jury, not a law enforcement agency but an investigating agency, not part and parcel of the usual law enforcement procedures assigned by statute to the Attorney General and the District Attorney but a highly unusual *judicial* procedure bottomed on the *inherent* power of a *court* to intercede in a highly specialized situation." (Emphasis in original).

This is an argument which sails a sea glittering with generalities, from which there emerges not one solid rock of jurisprudence on which one can stand and assert a tangible rule, or palpable principle, recognizable in law.

It is a mistake to assume that judges have unlimited power to "intercede in a highly specialized situation." A judge's function is to adjudicate and not to intercede, his duty is to pass upon questions presented to him in accordance with established procedure and not, of his own volition and initiative, to issue orders, edicts and decrees "bottomed" on his own personal estimate of a "highly specialized situation". The juridically im-

mortal Chief Justice MARSHALL spoke pointedly on this subject when he said: "Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course *prescribed by law;* and when that is discerned, it is the duty of the Court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law." (*Osborn v. U. S. Bank,* 9 Wheaton 738, 866, 6 L. Ed. 204.)

The contention of the intervening appellants splinters against the stone wall of these wise and authoritative words uttered by the greatest exponent of law in the history of our country. Our own Court, speaking through the scholarly Justice MITCHELL, said in the case of *Commonwealth v. Smith,* 185 Pa. 553: "No man, even for the accomplishment of a great good, can be permitted to set himself above the law, and least of all the judge appointed to administer it."

It is argued that the workload of a regular grand jury would not permit it to undertake an investigation, but in Philadelphia County it has always been the regular grand jury which conducted investigations.[11]

---

[11] Distinguished counsel former Justice Thomas D. McBride, Attorney Louis Lipschitz, Attorney Edwin P. Rome and Attorney Herbert S. Levin declared in their brief: "It is stated, however, that there are a number of instances wherein 'special grand juries' were utilized. An examination of all cases in which any such case could be even remotely authoritative in the present case discloses: (1) that no 'special grand juries have been utilized in Philadelphia; (2) that in none of the cases were the questions argued here raised; and (3) that in none of the cases in which a 'special grand jury' was impanelled was there a regular grand jury functioning

Moreover, under the Pennsylvania statute of March 18, 1875, provision is made for anticipating the call of a regular grand jury and of protracting its duration in order to dispose of any unusual workload. Section 2 provides that a grand jury may be summoned "to meet at such time prior to the holding of said terms as the judges of the said courts shall deem expedient; and if in the opinion of the said judges the business of the said courts at any time shall require it, the grand jury may be detained for an additional week without the issuing of a new venire." The amendatory Act of April 27, 1927, P. L. 420, allows the court to hold over the grand jury summoned for any term during the interim until the grand jury of the next succeeding term is assembled, with power to dispose of any business properly laid before a grand jury at a regular term.

If a regular grand jury conducting an investigation has not completed its work before the next grand jury is convened, it may be held over for a reasonable period of time to terminate its labors. (*Shenker v. Harr*, 332 Pa. 382.)

The glaring infirmity in this entire proceeding was the failure of the Criminal Courts of Philadelphia County to utilize the machinery already in existence. The order of July 11th not only ignored the time-honored, well-functioning constitutional institutions in the judicial department of government but set up an establishment which would compete with, interfere with, and eventually probably clash with the orderly administration of the law in Philadelphia County.

The order of July 11th directed an investigation which was unlimited in scope, timeless in duration, and responsible to but one person. Unlimited power of that character is incongruous anywhere in America,

and competent to investigate." Independent research would confirm this statement.

but particularly in Philadelphia, the birthplace of the American Republic. The order of July 11th directed the Special Grand Jury "to investigate and inquire into all matters set forth in the said petition and any other matters which may properly come before it, including the investigation of *any other unlawful* conduct on the part of any public official *or person within our jurisdiction.*"

This would mean that every person in the County of Philadelphia would be subject to the inquisitorial powers of this body; it would mean that every act in the whole catalogue of "unlawful conduct" ranging through the most trivial infractions of traffic regulations, assault and battery, larceny, misdemeanors of all types, and felonies up to and including murder, could be investigated; it would mean that preliminary proceedings in Magistrates' courts could be suspended while preliminary investigations were being made by the special grand jury. And then, not only did the order of July 11th make the whole world of crime, suspected crime, and suspicious circumstances the subject of investigation, it placed no limit on the period of time that this boundless probing, questing, hunting and investigating could go on. In the absence of threatened national disaster no such perpetuity or infinite powers are lodged in any branch of representative government. Justice, later Chief Justice, STERN, trenchantly warned in the case of *Shenker v. Harr*, 332 Pa. 382, 388: "A tendency to establish anything approaching permanency in a grand jury is repugnant to our scheme of government and subversive of individual rights."

In addition, there could be no assurance that, even with the best of intentions, the investigation authorized by the order of July 11th would not cross the boundaries of democratic limitations and become an engine of oppression, especially in view of the fact that the limits of the investigation were not marked by

wall, fence, hedge or even a painted line. The history of the rigors of overzestful inquisitors, the excesses of inquests having no limit in time and scope, the injustices which can result from searches that are not confined to a particular subject, is etched too deeply into the conscience of the American people for a free country to allow a resumption of a practice so fraught with tyrannical threat, and emancipation from which a bloody war was fought to attain. The fact that no such usurpation of the rights of the people was intended does not guarantee that abuses could not result. Good intentions in releasing a juggernaut will not heal the wounds of those crushed beneath its remorseless wheels.

The ever-building omnibus character of the scope of the Special Grand Jury investigation was made particularly manifest by the fact that on August 10th, Francis R. Smith, Treasurer of the Democratic County Executive Committee, filed a petition requesting that Judge ALESSANDRONI include in his charge to the Special Grand Jury the direction that it "investigate and inquire into the matter of unlawful and unreported contributions and expenditures by the Republican Alliance during the 1961 election."

On August 20th Judge ALESSANDRONI granted this petition stating "that the public interest requires the inclusion of this subject matter within the scope of the investigation and added that the investigation would not be limited to the activities of any one political party or committee, but will be applicable to the activities of all political parties or committees of political parties or *other persons within the jurisdiction of the Court.*"

The original purpose of the investigation was to inquire into charges of municipal illegalities. By now specifically including the *"activities"* of any "political party or committee," and all *persons* "within the jurisdiction of the Court" (meaning, of course, every sec-

tion, district, and far-flung area of the whole City and County of Philadelphia), the investigation could search into almost *any* type of activity of *any* individual. Such universality of probing, such unrestrained delving into the affairs of the whole community and unlimited questioning into the private business and matters of the people would be a direct menace to the peace, security, and tranquillity of every family in Philadelphia and could set aside regular constitutional government. Such absolute authority is alien to the free institutions of this country, and this Court will not permit it to take hold.

Sir William Blackstone, the imperishably great expounder of the Common Law, said in his Commentaries, which are accepted by every American lawyer as the basis of all ordered law in English-speaking countries, that: *"the public good is in nothing more essentially interested than in the protection of every individual's private rights."* (1 Bl. Comm. 139)

An illustration of how one abuse of power may lead to another is to be observed in the 33rd Finding of Fact by Court of Common Pleas No. 6, which stated that the City Council of Philadelphia appropriated $112,000 for the Special Grand Jury investigation, "at the special instance and request of Judge ALESSANDRONI."

Here we do not have a request from the Board of Judges; we do not find a requisition submitted in the name of a general judicial authority; what is revealed here is an importunity on the legislative branch of the government by a single member of the judicial branch. Judge ALESSANDRONI personally appeared before the Finance Committee of the City Council in behalf of the appropriation. That he unquestionably made the request in a most courteous manner and that Council acceded to his request graciously does not detract from the peril of the encroachment of one government department on the authority of another.

Once regular procedure is ignored, irregularities follow quickly and without trammel. On July 18th Judge ALESSANDRONI issued the following order: "pursuant to the order of the court dated the 11th day of July, 1962, W. Wilson White, Esquire, is hereby appointed Special Prosecutor in connection with the Special Grand Jury to be convened as set forth in said order. He is accordingly authorized and directed to perform all of the duties lawfully incumbent upon him as Special Prosecutor and to investigate and inquire into all matters that may properly come before the said Special Grand Jury, including the investigation of *any unlawful conduct* on the part of any public official *or person* within our jurisdiction and to aid the Special Grand Jury in the making of proper presentment or presentments to the court as the ends of justice may require."

As already stated, there is no public office in Pennsylvania known as Special Prosecutor. In his Concurring Opinion in *Hamilton Appeal,* 407 Pa. 366, Justice COHEN listed 21 reported cases involving grand jury investigations, either requested or accomplished. In not one of them was there an official of any kind with duties even distantly approximating those assigned to W. Wilson White by Judge ALESSANDRONI.

Not only does the office of Special Prosecutor not exist in Pennsylvania but there is no person in Pennsylvania on whom Judge ALESSANDRONI, or even the Pennsylvania Legislature, could bestow the unconstitutional powers and the concomitant unconstitutional immunities implicit in the learned judge's order. Under the provisions of that order, W. Wilson White would be empowered to investigate the "unlawful conduct" of *any person* within the vast geographical domains of metropolitan Philadelphia.

Whether conduct is or is not unlawful can only be determined through judicial process, but by means of

this amazing document, which is without precedent or parallel in the history of Pennsylvania's courts, W. Wilson White could investigate, quiz, harass, harry, annoy, badger, command and worry any number of two million inhabitants on any subject which, according to his own unrestricted judgment, came within the purview of "unlawful conduct."[12]

And in the exercise of this incredible authority Mr. White would not be answerable to anyone for misbehavior or usurpations. Not holding a constitutional office he would not be subject to impeachment; being clothed with judicial sanction he would be immune from criminal prosecution; engaged in governmental business he could not be sued civilly. No person in the United States may constitutionally wear such impenetrable armor against responsibility for possible illegal performance. The clanking of such armor would be an incongruous sound anywhere, but particularly so in Philadelphia which heard the music of the Liberty Bell proclaiming "Liberty throughout the land unto all the inhabitants thereof." One of the reasons why Americans rebelled against the tyrannical King George III was described by Thomas Jefferson: "He has erected a multitude of New Offices, and sent hither swarms of Officers to harass our People, and eat out their substance."

The order of July 11th and those which followed created new offices having no responsibility to anyone except their appointer. On July 25th Judge ALESSAN-DRONI appointed F. Hastings Griffin, who is not even a resident of Philadelphia, as assistant to the Special

---

[12] There is no indication, and it is not suggested, that W. Wilson White, who is an estimable member of the bar, would consciously lend himself to the infringement of the rights of others, but absolute power, especially when delegated to subordinates, is a high powered tension wire which must be insulated with constitutional safeguards if democracy is to remain safe.

582

Prosecutor. Of course, in point of law, his office could have no authority whatever since there can be no assistant to a myth.

On August 15th Judge ALESSANDRONI ordered that space be obtained beyond the courthouse, specifically in the Widener Building, for the quartering of the Special Grand Jury. The order specifically stated that access to the Grand Jury Room was to be "by means of room known as No. 630." Room 630 happens to be the very office of F. Hastings Griffin, the assistant Special Prosecutor.[13] It is almost shocking to contemplate that a prosecutor who, after all, is an advocate, should be allowed to have intimate contact with the members of the tribunal who are to pass on matters he brings before that tribunal—a tribunal which is the safeguard of the liberties of the citizens of Philadelphia. This is but another illustration of the danger of turning strictly governmental responsibility over to private individuals who bring to the job the atmosphere of a personal, partisan pursuit rather than investing it with all the dignity and solemnity of unyielding neutrality.

Almost with the appurtenances and appearance of an occupying expeditionary force, W. Wilson White, at a salary of $20,000 a year and F. Hastings Griffin, at a salary of $17,500 a year, moved into the Widener Building with staff made up of attorneys, investigators, detectives, stenographers and clerks, together with desks, filing cabinets and other furniture. All this in spite of the fact that there already exist a grand jury, district attorney, detectives, clerks, stenographers, and quarters to house them, together with all appropriate equipment and furniture to accomplish the work involved in an orderly constitutional grand jury investi-

---

[13] In his affidavit of August 28th, Mr. Griffin states that his offices are "at Room 630 Widener Building."

gation. Nowhere in the opinion of the lower court or in the orders issued by it is there any explanation as to the reason for this costly duplication of effort, a very costly enterprise indeed. City Solicitor David Berger, in his argument in Court of Common Pleas No. 6, said: "We need not be naive about this, and I think as judges and lawyers, we need not be blind to facts we know as men; *the $112,000 is a drop in the bucket and it is only the first installment on this million dollar bill.*" The Court very aptly said that the Smith suit was "in the taxpayers' interest."

The order of July 18th not only constitutes an invasion of constitutional liberties as pointed out, but it would perpetrate another unconstitutional mischief. It would disfranchise the people of Philadelphia in the realm of their freedom to select a district attorney of their own choice. James C. Crumlish, Jr., was elected in accordance with the Constitution and the election laws of Pennsylvania. The learned judge who signed the order of July 18th summarily dismissed the District Attorney from all phases of the contemplated grand jury investigation. One of the duties of the District Attorney is to "attend upon a grand jury, lay before them all matters upon which they are to pass, aid them in the examination of witnesses and give general instructions as may be required." (*Com. v. Brownmiller*, 141 Pa. Superior Ct. 107, 113.)

The learned judge forbade him to do this. An appellate court should not have to spend time expatiating on the patent illegality of such an interdiction. The District Attorney may not be removed from his office except by impeachment. No judge may dictatorially order him to refrain from doing his work.

As stated earlier in this opinion, the learned Judge refused to consider the District Attorney's reply to the charges made against him in the Leonard petition. This refusal spells denial of due process and is there-

fore condemned completely. The whole evil in this entire proceeding is no more tellingly illustrated than by this arbitrary dismissal of a district attorney who has been elected by the people and putting in his place a person whose qualifications have not been passed upon by the people, to discharge serious and solemn duties which involve the liberties and securities of the people. The learned judge cited no authority for his unprecedented action. Nothing can more speedily demolish the rights of a citizen than to deny him defense against accusation; nothing could bring law into contempt more quickly than the announcement by word or example that there can be no opportunity to bring forth evidence of innocence against charges of misdeeds.

The purported Special Prosecutor and his assistant attempt to supply the deficiency in the judge's pronouncement by arguing, as they did in connection with the ordering of a Special Grand Jury, that the courts have "inherent power to make such appointments." In support of this assertion they cite *Com. v. Brownmiller,* 141 Pa. Superior Ct. 107. The facts in that case are wholly different from the ones at Bar. There, the District Attorney, who was conducting a grand jury investigation and who was not disturbed in the exercise of his constitutional power, petitioned the court for the appointment of several additional assistant district attorneys because of the unusual amount of labor involved in making his investigation and preparing for the submission of matters to the grand jury. Upon this presentation by the District Attorney, the President Judge of the Court of Quarter Sessions of Dauphin County authorized the appointment of the assistants prayed for. In the case at bar the District Attorney did not ask for any assistant district attorneys and he certainly did not ask to have himself displaced. The *Brownmiller* case established, as indicated, that a judge may authorize appointments upon suitable representa-

tion by the District Attorney, but the judge may not of his own volition order appointment of prosecuting personnel, nor may he order the District Attorney to appoint any particular person or persons. The judge must always remain the arbiter and not the prosecutor, he must decide and not advocate, he must adjudicate and not champion either side. The accused has as much right to ask the judge for a shield as the prosecution has the right to ask for a sword.

The facts in the case of *Com. ex rel. Shumaker v. N. Y. and Pa. Co.*, 378 Pa. 359, also cited by Mr. White and Mr. Griffin, do not even in candlelight resemble the circumstances in the instant case. In the *Shumaker* case the District Attorneys of Butler and Clarion Counties ordered several attorneys to "prosecute, negotiate, settle and superintend" a suit in equity to restrain as a public nuisance the alleged pollution of a river. This Court held that such delegation of power was illegal.

From the *Brownmiller* case the respondent-prosecutors quote the sentence: "[Courts] may do all things that are reasonably necessary for the administration of justice within the scope of their jurisdiction." They urge this quotation in support of both the ordering of the special grand jury and the appointment of the prosecutors, but it must be noted that the sentence in question contains the very vital limitation "within the scope of their jurisdiction." The judicial actions of Judge ALESSANDRONI went beyond the scope of his jurisdiction, as already demonstrated.

No Court may remove a district attorney of its own volition, nor may it, by appointing someone else to act in his place, accomplish the same result of removal. We said in *Snyder's Case*, 301 Pa. 276, 288, that: "Where the Constitution or statute points out a method for the removal of a public officer, that is exclusive of other methods."

The respondent-prosecutors then argue that they are de facto officers and that their right to hold their respective offices can be attacked only in a quo warranto proceeding, but here again they deal in suggestions and shadows without bringing the issue into authoritative relief. They say: "There is no doubt that the special prosecutor, appointed by court order on July 18, 1962, as well as the assistant prosecutor, appointed July 25, 1962, are discharging their duties on behalf of the public under appointments giving them color of title. As such, they are de facto officers whose authority can be attacked only in a direct proceeding for that purpose."

This statement is mere ipse dixit. Mr. White and Mr. Griffin cannot be de facto officers when they hold forth in a post which does not exist, and they challenge a constitutional official who is in possession of his office by election, and currently exercising the rights, privileges and prerogatives of that office. James C. Crumlish, Jr., is the District Attorney de jure of Philadelphia County. (*People v. Brautigan,* 310 Ill. 472).

The appointment of W. Wilson White to take the place of the District Attorney James C. Crumlish was additionally illegal because Paul M. Chalfin, Esq., was First Assistant District Attorney of the County of Philadelphia, and, in accordance with the Act of June 3, 1919, P. L. 370, §2 (16 P.S. §7723), was empowered to act as District Attorney in the event, for any reason, the District Attorney was unable to act.

If Judge ALESSANDRONI or any judge can displace a duly elected district attorney by fiat (because the order of July 18th cannot be regarded otherwise), he can find some reason or lack of reason to displace the elected Clerk of Courts; if he can displace the Clerk of Courts he can go on to displace the elected Prothonotary and then the elected Sheriff, so that in time the courthouse would be under one-judge rule.

It is asserted by the respondent-prosecutors that the District Attorney acquiesced in the appointment of a Special Prosecutor. The District Attorney explains that it was his understanding that the person to be appointed would be some one legally qualified, that is, one taken from the District Attorney's office. However, regardless of that modification, the District Attorney could not agree constitutionally to divest himself of any duty attendant upon his office as an elected district attorney. (*Commonwealth ex rel. Shumaker v. N. Y. & Pa. Co.*, 378 Pa. 359).

The order of July 18th, aside from its illegality, was a blow at self-government and an infringement of the rights of the people. No amount of good intention on the part of the judges who signed the order, no amount of good will or even assumption of doing one's duty, can justify so autocratic, unwarranted, and illegal a procedure. Americans do not take kindly to despotism whether it wear the cloak of officialdom or thunders at the door at night.

In supporting the orders of July 18th and July 25th appointing them respectively, as Special Prosecutor and Assistant Special Prosecutor, Mr. White and Mr. Griffin assert: "Just as the power to convene a special grand jury is an inherent, constitutional, judicial power, so the power to implement and supplement by the appointment of special assistants to the court is inherent as part of the judicial function."

Here they attempt to uphold two fallacious theses by thrusting one under the other. But a scaffolding that is too weak to uphold itself cannot sustain anything else. The power to convene a special grand jury is not an inherent judicial power and therefore cannot support the appointment of special prosecutors as part of the judicial function.

In his brief Mr. White argues that he is "an arm of the court enabling the court better to perform the

court's undertaking to see that a special grand jury *investigation* is conducted." (Emphasis in original.)

A Court has no arm beyond its own judicial anatomy; it cannot delegate judicial power.

The respondent-prosecutors reveal a serious misapprehension of judicial duties, power and authority. They speak of the grand jury investigation they proposed to carry out as if it were a personal project of Judge ALESSANDRONI'S. They say: "Just because other courts saw fit in the exercise of their judicial discretion to have the usual law enforcement officials participate in the court's investigation does not mean that Judge ALESSANDRONI *had* to do it that way." (Emphasis in original).

But Judge ALESSANDRONI must follow, as of course he unquestionably desires to do, the procedures authorized and directed by established law. John Adams, one of the immortal builders of our Republic, declared that our government is one "of laws, and not of men."

As a matter of fact, even if the special grand jury investigation were legal, it was not legally established that Judge ALESSANDRONI was the judge to preside over it. It is an astonishing phenomenon that in all the orders, opinions and memoranda filed in this case there is not one statement authorizing Judge ALESSANDRONI'S presidency over the assumed investigation. Not only is there no authorization from the Board of Judges, not only is there no schedule which even suggests he should conduct a grand jury investigation, but there is not the slightest intimation from any one of the other twenty judges potentially available for presiding that Judge ALESSANDRONI was the one to preside. Through a series of chance and forced events wholly unrelated to order, system, control and official responsibility, it has been assumed that because, through an enigmatic misdirection, the Leonard petition came into Judge ALESSANDRONI'S hands, he and he alone possessed the power to

call a grand jury investigation, appoint the attorneys to run it, arrange for financing it, and dictate its scope and duration. Such judicial usurpation by suggestion, atmosphere and circumstance is not consistent with orderly judicial process and must be condemned. A judge is not permitted to exercise any type of jurisdiction or control which his personal inclinations dictate or his imagination may encompass.

Pursuing their erroneous concept of judicial power, the respondent-prosecutors say: "It is perfectly clear that to achieve the ends of justice in certain cases the existence of the inherent power in the courts to appoint assistants is fundamental. Where the circumstances are such that the judge convening the special grand jury is not *satisfied* to call upon the District Attorney or Attorney General the power must lie in the court to conduct its own business in its own way."

They say further that Judge ALESSANDRONI had the right "to approve professional help of his own choosing," that he has the right to "pursue justice as he sees it," and that, with regard to the Special Grand Jury, he has "the right to conduct it his way." The powers which the respondent-prosecutors would confer upon a judge are the powers of absolutism, the powers of a Star Chamber Judge, the powers of a Lord George Jeffreys.

Nothing could be more destructive of judicial responsibility, nothing could more quickly destroy faith in the courts, nothing could more easily weaken the very foundations of democratic government than for a judge to have the autocratic, unlimited power, when he is "not satisfied" with constitutional officers, to dismiss them at his own pleasure and to conduct the business of the court in his "own way." While, of course, a judge operates within an extensive latitude of discretion when it comes to rendering decisions, he is still bound by the Constitution and the laws of the land as much as the lawyer, the litigant and the tipstaff.

The respondent-prosecutors cite the case of *Commonwealth v. Shaffer,* 178 Pa. 409, as a precedent for the appointment of a Special Prosecutor. There is not the slightest similarity between the facts in that case and those before us. There the district attorney called two members of the bar to assist him in the trial of a murder case because he had just recently come into office and, in addition, he was to be a witness. Moreover, the trial occurred in 1896, long before the Supersession Act.

The respondent-prosecutors argue further that "Judicial functions must be carried on independently and without interference from either the legislative or the executive branch of government." Obeying the laws enacted by the representatives of the people can in no manner of meaning be interpreted as interference by the Legislature.

Once the Gargantuan wheel of unconstitutional appointment started down the hill of unrestrained authority, it was inevitable that it would collide with other authorities and further confusion would be added to the already mixed-up situation which began when the Leonard petition was unaccountably not filed with the judge in charge of the Grand Jury for the month of March.

After Mr. White and Mr. Griffin began to operate under the orders discussed, the City Council took up for consideration the question as to whether F. Hastings Griffin, Jr., who was to be paid $17,500 per year out of the funds appropriated by City Council for the grand jury investigation, possessed the detachment and the impartiality required to conduct an impartial investigation. As a result of this consideration, City Council on August 23rd enacted a resolution appointing a committee of five councilmen to conduct an inquiry and to hold hearings "concerning charges against F. Hastings Griffin, Jr., Esq., made by Councilman

William A. Dwyer, Jr., of the Sixth Councilmanic District."

On the following day Mr. Griffin retained Attorney Robert M. Landis to represent him in the councilmanic proceedings.

With the written approval of City Solicitor David Berger, Council appointed Abraham E. Freedman, Esq., as special counsel to conduct the councilmanic inquiry. The first public hearing was scheduled for August 29th.

On August 27th the City Council issued a subpoena, over the signature of Paul D'Ortona, President Pro Tempore of the City Council, commanding Mr. Griffin to appear at the August 29th hearing. According to a sworn statement made by City Solicitor Berger, Mr. Griffin, on learning of the subpoena, publicly declared that he was willing to appear as a witness at the inquiry and that he looked forward to the opportunity of cross-examining witnesses, including but not limited to Councilmen Paul D'Ortona and William Dwyer, "whom he publicly stated he would 'tear into shreds.'"

As Attorney for Mr. Griffin, Mr. Landis on August 27th wrote Council President Pro Tempore D'Ortona asking to be informed regarding the purposes of the councilmanic inquiry. On that same day, without informing City Solicitor David Berger of his intention to do so, Mr. Landis called on Judge ALESSADRONI and informed him that he (Mr. Landis) had advised Mr. Griffin not to appear before Council.

On August 28th Mr. Berger replied to Landis's inquiry regarding the purposes of the hearing scheduled for the next day, stating, inter alia: "The purpose of the councilmanic inquiry is to determine whether or not the monies appropriated by City Council toward the cost of conducting a Special Grand Jury Investigation ordered by Judge ALESSANDRONI are being properly expended. This investigation takes on added significance due to the obvious fact that the $112,000 ap-

propriated may only defray part of the expenses of the Special Grand Jury Investigation. A request for additional appropriations will then have to be made to City Council.

"The expenditure of these public monies is justifiable and appropriate only if they are used to conduct a proper investigation, i.e., one free from political or other bias and one which will be impartial, calm and based on a dispassionate study of the facts and law.

"Since the councilmanic appropriation, public statements have been made which the Council believes indicate grave doubt as to whether F. Hastings Griffin, Jr., Esquire is qualified to conduct a proper investigation free from political or other bias and one which will be impartial, calm and based on a dispassionate study of the facts and law."

Between 8:30 and 9 o'clock of that same evening, again without informing the City Solicitor that he intended to do so, Mr. Landis called on Judge ALESSANDRONI and presented a petition in the name of F. Hastings Griffin, Jr., Esquire and W. Wilson White, Esquire, for a rule upon Council President Pro Tempore D'Ortona and the other members of the named Councilmanic Committee, plus the City Solicitor and the special counsel Abraham E. Freedman, to show cause why the Griffin subpoena should not be quashed and the Committee restrained from conducting the investigation into Mr. Griffin's fitness as an investigator and assistant Special Prosecutor in the Special Grand Jury Investigation. That same evening Judge ALESSANDRONI signed an order making the rule returnable on August 31st, but in the meantime restraining the respondents from conducting the hearing.

The restraining order was not served on the named councilmen, the City Solicitor and Special Counsel Freedman until the next morning a few minutes before the councilmanic hearing was to begin. On August 31st argument was heard before Judge ALESSANDRONI,

together with Judges WEINROTT and REIMEL, on the rule. Judge ALESSANDRONI refused to lift the restraining order, and Council President Pro Tempore D'Ortona with the others listed as respondents, appealed to this Court.[14]

The appellant Councilmen and Special Counsel Freedman in this particular appeal contend that the restraining order signed by Judge ALESSANDRONI was null and void because (1) the court, sitting as a court of quarter sessions, was without jurisdiction to issue an order which was in the nature of an injunction and therefore strictly within the jurisdiction of equity alone; (2) that the order issued without bond being filed and (3) that, under the doctrine of separation of powers, it constituted an unconstitutional interference with the legislative department of government.

The appellees contend, on the other hand, that the action of City Council in ordering the Griffin inquiry was (1) an attempted invasion of judicial powers; (2) an unlawful interference with the Special Grand Jury investigation; (3) and an invalid extension of the Council's powers under the Philadelphia Home Rule Charter.

A discussion of this feature of the four cases on appeal warrants emphasizing once again that if the original Leonard petition had been properly handled at the beginning, all these subsequent proceedings would not have been necessary and they could not have blundered into the many labyrinthian passages here recounted (plus others not mentioned) resulting in a multiplicity of actions, hearings, arguments and extraordinary legal-procedural entanglements in what had been from the inception a simple, uncomplicated matter. But since the Gordian knot is here, the appellate blade must function.

---

[14] David Berger's name was struck off as a respondent in the proceedings since he was counsel for the City.

To begin with, there can be no question that a legislative body has the right to conduct any investigation which will disclose data, facts and other information needed to guide proper and enlightened consideration of a legislative project. As late as 1960, this Court said in *McGinley v. Scott,* 401 Pa. 310, 320: "The right to investigate in order to acquire factual knowledge concerning particular subjects which will, or may, aid the legislators in their efforts to determine if, or in what manner, they should exercise their powers, is an inherent right of a legislative body, ancillary to, but distinct from, such powers."

Nor can there be any question that City Council is authorized by Section 2-400 of the Philadelphia Home Rule Charter to conduct investigations: "The Council shall have power by resolution to authorize inquiries and investigations to be conducted by the entire body or by any of its committees in aid of its legislative powers and functions."

The appellees argue that since Mr. Griffin was selected by the Court to investigate matters which involved City Council itself, it was improper for City Council to investigate the investigator. That he was chosen by Judge ALESSANDRONI an assistant to the purported Special Prosecutor, was, insofar as this litigation is concerned, a coincidence; and that he was eventually to inquire into the affairs of City Council was a fortuitous sequel to that coincidence. The essential ingredient in this procedural potpourri is that Mr. Griffin was being paid by City Council to do a job. Was he qualified to do that job? Whether his job was that of investigator, lawyer, architect or carpenter was immaterial, the City Council owed it to the citizenry of Philadelphia to ascertain whether it was properly withdrawing funds from the public purse. Certainly, to use an extreme illustration, if the person who was the subject of investigation, could not speak English,

no one could question the right of Council to inquire as to whether $17,500 of the taxpayers' funds should be turned over to one so obviously disqualified for the job in question. Deficiency in language is no more an impediment in conducting an impartial and proper investigation than deficiency in a respect for impartiality.

It was charged that Mr. Griffin had represented certain clients whose interests could be affected by the investigation and that he was a member of a law firm in such a manner as to present a conflict of interests. Under these circumstances Council would have been remiss in not making appropriate inquiry regarding Mr. Griffin's qualifications for the serious employment he was to undertake. The $112,000 appropriated by Council for the grand jury investigation was admitted by all to be only the first installment in what was to become a very expensive undertaking. Assuming arguendo that Council had lost its chance to inquire into Griffin's qualifications so far as the first $112,000 was concerned since the appropriation was now a fait accompli, it cannot possibly be questioned that it would have the right to determine if Griffin should receive any part of the additional stream of money which was to pour from the City treasury. To deny to any tax-making body the right to inquire as to how tax monies are to be spent is to embark on a sea of financial anarchy.

The Supreme Court of the United States said in the case of *East St. Louis v. United States,* 110 U. S. 321, 324, that "the question what expenditures are proper and necessary for the municipal administration, is not judicial; it is confided by law to the discretion of the municipal authorities. No court has the right to control that discretion, much less to usurp and supersede it."

Judge ALESSANDRONI'S action, therefore, aimed at quashing the Griffin subpoena and restraining the City Council was not only untimely but constituted an unwarranted interference with the orderly functioning of the legislative branch of the City government. The intervention on August 31st of the three-judge court, made up of Judges ALESSANDRONI, WEINROTT and REIMEL was even more unwarranted and unauthorized in law. This anomalous proceeding emphasizes the loose, uncoordinating, acephalous administration of the Criminal Courts of Philadelphia County insofar as it has been placed in disconcerting relief in this case. Not one of the three enumerated judges was on assignment in criminal court. Yet they sat as a purported court en banc in quarter sessions, they heard arguments, deliberated and finally, under the heading of the court of quarter sessions, put into effect what amounted to a decree in equity. If, for no other purpose than to recount this judicial jumble, so that steps may be taken to avoid similar conduct in the future, it has been necessary to discuss this feature of the case, even though in the eventual decision on the Special Grand Jury, the issue over the subpoena and restraining order is really moot.

The appellees deprecate and degrade the City Council as a legislative body, stating that it "cannot pretend to exercise constitutional legislative powers. It operates as an arm of local municipal self-government, only by sufference of the legislature of the State, only on hand-me-down powers doled out to it by the legislature through the First Class City Home Rule Act."

This derogatory language finds no confirmation in decisions of this Court on the authority, the dignity and the powers of Philadelphia's home rule government. The government of Philadelphia is one established by the sovereign power of the people through a constitutional plebiscite ordered, supervised and di-

rected by the General Assembly representing all the people of Pennsylvania. In the *Addison Case,* 385 Pa. 48, 57, this Court said: "That the Charter constituted legislation no less than does a statute of the legislature to like end is too plain for even cavil. Whether a municipal charter comes into being by direct statutory grant of the legislature or by adoption by the constituent electorate in the exercise of power constitutionally reposed, it is as much legislative in the one instance as in the other and has equal legal force and standing in both. Indeed, *a constitutionally permissible adoption of a municipal charter by the electorate is not one whit less in dignity than a statute of the legislature granting a charter* . . . Specifically, therefore, Philadelphia's Home Rule Charter constitutes legislation (i.e., the adoption or enactment of a law by a competent body), just as much as did the City's Charter of 1919 which the legislature itself enacted. Wherefore, upon its due adoption, *Philadelphia's Home Rule Charter took on the force and status of a legislative enactment.*"

The appellees point out that city governments are creatures of the Legislature, and that "they have only such powers and authority in the exercise of local self-government as may be delegated to them by the legislature, within the restrictions, limitations and regulations imposed by the legislature itself."

This is true but it does not follow that where the legislature does give city governments complete power to exercise self-government, that that power to operate is to be regarded as of an inferior character and that it can be ignored and even trampled upon with impunity by the judicial branch or any other branch of government. City Council is made up of persons who have been chosen through the democratic processes of popular election, and, as representatives of the people they are entitled to the respect and consideration their offices demand.

There has been a noticeable and regrettable tendency in oral argument and written brief in this case to treat slightingly and even with some disdain the officials who hold office by election and who have figured in this case in one way or another. It is even suggested that simply because they are the choice of the people that in some manner this fact impairs their usefulness as responsible agents of government. Of course, it does not need to be said that a person who presents himself as a candidate for any office and is placed in office by the majority of the people is presumed to have the qualifications for that particular office and to possess the moral fortitude to discharge the duties of that office in accordance with the oath he takes to accomplish those duties and to act conscientiously and in strict accordance with the law. If an official fails to meet the high requirements of his office, the people have the opportunity to register their disapproval at the polls, but until there has been misconduct which calls for removal through regular procedures definitively established and admitting of no deviation, an official is entitled to the respect and the cooperation of all other law-abiding persons.

Thus, the statement in appellees' brief that the City Council "stands on a lower level of governmental power from the constitutional power exercised by the court below" is not correct. When persons or bodies in government exercise the power granted to them constitutionally and in accordance with the law of the land they do not stand beneath any other person or body. Their acts may be reviewed but, in dignity and within the limits of their jurisdiction, a justice of the peace is entitled to as much respect as a Justice of the Supreme Court and a city councilman as much as a senator.

The appellees say in their brief that "no subordinate municipal legislative subcommittee can thus encroach

upon the constitutional powers of the judiciary." It is
no more encroachment upon the constitutional powers
of the judiciary for the legislature of the city to deter-
mine whether an employee they must pay is qualified
to perform his duties than for Council, as it does regu-
larly, pass upon the payment of salaries for judges'
law clerks and stenographers. If Council decides to
pay less or more salary for a judge's law clerk, it is
not constituting itself a "kangaroo court", as the ap-
pellees have improperly characterized City Council for
determining what amount, if any at all, it should pay
Griffin.

The brief of the appellees charges City Council with
" 'an arrogant invasion of judicial power' and 'a de-
liberate desecration of the basic constitutional prin-
ciple of separation of powers by this subordinate mu-
nicipal Council committee.' "

The record is bare of any evidence to warrant so
extreme a statement.

We have discussed at some length the question pre-
sented in this feature of the appeal because of the im-
portant issue of governmental powers, but we do not
in the end resolve that either side is free of error. The
restraining order was illegal and of no effect because
of the constitution of the Court, its lack of jurisdiction
and for the other reasons we have enumerated; the
City Council could not have proceeded with its an-
nounced investigation because the resolution under
which it was operating failed to announce any legis-
lative purpose. Mr. Berger's letter to Mr. Landis sup-
plied that purpose but it was not made a part of the
resolution.

During the argument before this Court, the City
Solicitor of Philadelphia asked the Court for directions
on the subject of grand jury investigations. The mat-
ter of grand jury investigations is decided factually at
the level of ascertainable facts, to the end that any

necessary corrective action, in keeping with the requirements of law and justice, may be taken.

Perhaps the most recent and succinctly worded exposition on grand jury investigations in Pennsylvania was made by Chief Justice KEPHART in *McNair's Petition*, 324 Pa. 48, which can profitably be consulted at all times by judges, district attorneys and public officials, as well as all those who wish to see crime detected, fault remedied, law violators suppressed, and the innocent saved from unjust accusation and unfair censure.

From the foregoing, this Court concludes and orders:

1. The decree of the Court of Common Pleas No. 6, here appealed from, is affirmed, with the exception of its finding that Judge ALESSANDRONI was acting within his jurisdiction when he signed the Order of July 11, 1962, which finding is negatived.

2. The order signed by President Judge ALESSANDRONI, dated July 11, 1962, was without authority of law, and is therefore null and void.

3. The orders dated July 18, July 25, August 2, August 15, August 20, August 21, and all other orders appertaining to the Special Grand Jury and the Special Prosecutor and the Assistant Special Prosecutor, whether communicated orally or in writing, were without authority of law and are therefore null and void.

4. The restraining order of August 28 on members of the Council of the City of Philadelphia and attorneys, supplemented orally and otherwise by Judge ALESSANDRONI or anyone acting under his direction, was illegally made and is therefore null and void.

5. The resolution of the Council of the City of Philadelphia, numbered 264 and dated August 23, 1962, did not sufficiently describe its purpose and is therefore null and void.

6. The petition for writ of prohibition on behalf of James C. Crumlish, Jr., District Attorney of Philadelphia, directed to Judge ALESSANDRONI and W. Wilson White, Esq., is ordered to issue as prayed for.

7. The application of W. Wilson White, plaintiff, for writs of mandamus and prohibition against Judges GOLD, BLANC and KELLEY, is denied.

## Comment on Dissenting and Concurring Opinion

The dissenting and concurring opinion or Minority Opinion, as it will hereinafter be referred to, makes frequent reference to "guilty persons" and "criminals." Nothing is more fundamental in every land of liberty and justice than that no person is presumed guilty until found so by a jury of peers. Every person under the flag of the United States is presumed innocent until proved guilty.

The Minority Opinion says: "District Attorney Crumlish is disqualified from conducting any grand jury investigation into the aforesaid alleged widespread corruption and crime."

There was never any adjudication to this effect so that this statement in the Minority Opinion is not only unfair and unjust but utterly ignores the record. As stated in the Majority Opinion, Judge ALESSANDRONI in utter disregard of proper procedure ignored a sworn pleading filed by the District Attorney. The Minority Opinion does the same.

The Minority Opinion says that W. Wilson White should have been added as an indispensable party in the proceedings before Court of Common Pleas No. 6. The only reason he was not so included is that he refused to be included. City Solicitor David Berger, in addressing Justice JONES of this Court at the night session in Wilkes-Barre on August 29th, said in the presence of Mr. White: "He [Mr. White] was asked in my presence to become a party, and he summarily re-

jected the invitation. Judge GOLD said, 'I am going to invite Mr. White, the Crime Commission, the Committee of Seventy, the Republican Alliance which filed the original petition which was heard by Judge ALESSANDRONI, the Attorney General.' And he said, 'I will invite all these people in; do you, Mr. Berger, and do you, Mr. Lipschitz object?' And Mr. Lipschitz said 'No.' 'And do you, Mr. Berger, object?' I said, 'No. I welcome all these people in.' And Mr. White summarily rejected the invitation. *He said he is not and will not become a party to this proceeding.*"

It can be a question as to whether Mr. White, in spite of his refusal to formally become a party, did not in fact enter full-fledgedly into the litigation. After Mr. Berger completed his argument before Justice JONES of this Court in the night session referred to, Mr. White replied. He said: "My standing is this: I have been directed by the order appointing me to carry forward this investigation, to get ready as soon as we possibly can for the grand jury investigation proceedings, which in the order appointing the grand jury the court found so urgently required. Should this taxpayers' suit be successful I would be wholly unable to perform my duties."

Mr. White not only replied to Mr. Berger, he made a full length argument, he cited and analyzed cases, he presented a brief. It would be difficult to conceive a more complete involvement, entirely voluntarily, in a lawsuit than Mr. White's participation. And there can be little merit to any assumption that the case in Court of Common Pleas No. 6 was somehow proceeded with and disposed of by denying to Mr. White the fullest opportunity to be heard.

The Minority Opinion then says that the suit in Court of Common Pleas No. 6 should have named as party defendants also "all other members of the investigating staff." If Miss Smith had to name all

members of the investigating staff, she would have had to include also the names of all stenographers, typists, file clerks, messengers, janitors, and every one who could conceivably have been affected by the eventual decision. Obviously such a multitudinous inclusion was not only not necessary but it would have been decidedly improper to have named them, since they were merely corks bobbing on the sea of litigation. Lawsuits deal with the ships and their courses of action, not the wake of each vessel as it pursues its way toward its destined port.

The indispensable parties in this case were those who were ordered by the *City Council of Philadelphia* to pay out taxpayers' money. The finance officers of the City and the Courts were the ones to be sued and they were duly sued, and they were duly served and duly litigated. Miss Smith's action was aimed at tying up the purse strings of the City Treasury which had been, she claimed, improperly loosened. Her case was duly litigated and the purse strings were duly tied.

The Minority Opinion says that "The net result was that there was no person or lawyer[15] to oppose the taxpayer's suit or to protect any of the parties who had a direct, immediate and pecuniary interest in the suit." The record shows that at the hearing in the Court of Common Pleas No. 6, the following attorneys spoke in opposition to the taxpayer's suit, namely, Edward E. Russell, Esq., for the "Committee of Seventy"; Herbert A. Fogel, Esq., for the Republican Alliance; Daniel B. Michie, Jr., for the Crime Commission. If Mr. White did not speak at this particular hearing, it would seem to have been because of the plan he had mapped out

---

[15] The Minority Opinion says that the numerous actions filed in this case "reflected no credit on the bar." Lawyers are hired to present clients and it is their duty to do so. There is no indication that the lawyers in this case have not conducted themselves properly and ethically.

to participate in the battle to the extent of opposition but to make himself a non-combatant with regard to any decision which might be hurtful to his position. We have seen to what extent he acknowledged the common pleas action in that he petitioned this court for a writ of mandamus to transfer the cause to Judge ALESSANDRONI'S court. If he were not a party litigant, on what possible basis could he ask for the transfer of a case from one court to another?

However, even if the matter is to be disposed of on a technicality, it can be seen easily that the cases cited by the Minority Opinion in no way support the proposition advanced by the Minority as to indispensable parties. The Minority quotes from *Hartley v. Langkamp & Elder,* 243 Pa. 550: ". . . 'A party is indispensable when he has such an interest that a final decree cannot be made without affecting it, or leaving the controversy in such a condition that the final determination may be wholly inconsistent with equity and good conscience.' "

This, of course, is hornbook law. The question is: What makes a party indispensable to the extent that he must be named and served as a party?

The Minority Opinion states that the District Attorney contends that since the District Attorney is a constitutionally ordained officer who is elected by the people he can never be superseded as to any of his functions. The District Attorney makes no such contention. Obviously he is bound by Acts of the Legislature and therefore can be superseded under conditions announced by the Legislature. What he contends, and rightly so, is that he may not be superseded simply on the ipse dixit of a judge. Nor is there a single case (to say nothing of a statute) in the whole library of Pennsylvania law which empowers a judge to so act. The Minority Opinion, in attempted support of its position, quotes from the case of *Commonwealth v. Mc-*

*Hale,* 97 Pa. 397, but the very quotation carries its own eraser wiping out completely what is contended for it by the Minority, namely, "It was urged, however, that the indictments were properly quashed because not signed by the district attorney. They were signed by Guy E. Farquhar, Esq., who was specially appointed by the court to try these cases, *under the Act of 12th March 1866, Pamph. L. 85.* The appointment appears to have been regularly made *in accordance with the provisions of said act . . ."*

That case involved election frauds in an election where the district attorney was a candidate. Moreover, it is to be noted that this case occurred in 1881, prior to the Act of Supersession which is now part of the Administrative Code and, therefore, *controlling.*

Then the Minority Opinion says: "Even more astonishing is the present contention of the District Attorney and others that an Attorney General, unless specifically authorized by statute, has no power to supersede a District Attorney."

This question is not involved in the present case nor is it raised by anyone. What powers the Attorney General may have over district attorneys under common law is a subject for discussion since there were no district attorneys at common law, but that discussion has no place here since our issue is whether a judge on his own initiative may oust a district attorney from the performance of his duties. In any event, the powers of a single judge cannot be equated with those of the Attorney General where supersession is involved, since the judge lacks any statute, common law or decisional authority to act in a supersessional capacity.

Mr. Justice BENJAMIN R. JONES and Mr. Justice O'BRIEN concur in the result.

DISSENTING AND CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

The majority have utterly failed to decide the two most important questions involved in these cases:

(1) Should there be a grand jury investigation; and

(2) Who should conduct it?

It is clear as the noonday sun in a cloudless summer sky:

(1) A grand jury investigation of all the alleged sale of legislation by members of City Council, and the alleged widespread graft, corruption and crime by important public officials in Philadelphia's City Government, and by members of the Democratic City Committee, and others who allegedly conspired with them, *is imperatively required to protect the public interest* and in order to ferret out the crimes and the criminals.

(2) This grand jury investigation, which should have been commenced months ago, must not be impeded any longer by "stalling" tactics which are employed by those who are about to be investigated, or by dilatory court proceedings which deliberately or unintentionally seriously delay the investigation and allow guilty persons to cover their tracks and/or to escape punishment through the running of the statute of limitations. Such court proceedings necessarily jeopardize or deny Justice.

(3) The grand jury investigation must be conducted under the direction and supervision of able lawyers who are completely independent and impartial and have no close connections with any of the parties who are or may be involved.

(4) District Attorney Crumlish is disqualified from conducting any grand jury investigation into the aforesaid alleged widespread corruption and crime:

(a) because of his incapacity in this very important matter, or long and inexcusable failure to investigate the charges of the alleged criminal conduct of the "higher-ups" in the City Administration and of the Democratic party, as well as the alleged corruption in City Council—an unjustifiable failure which in spite of his denials is a matter of common *knowledge* in Philadelphia; and

(b) *particularly* because of his strenuous opposition for months to any such investigation, *and his allegations of record that a grand jury investigation was— until recently—"entirely unnecessary"*. Crumlish's last minute conversion to the necessity for a grand jury investigation, provided he is the investigator (after the cases had been orally argued in this Court) cannot blot out his prior vigorous opposition or give any reliable assurance that he can and will conduct a speedy, thorough and impartial investigation of his friends and supporters in City Council and in the higher echelons of the Democratic party.

To permit District Attorney Crumlish to conduct such an investigation—which, we repeat, he has until a few weeks ago so strenuously opposed *publicly and in the Courts as absolutely unnecessary*—would not only be "improper", but would make a mockery of the law and be a travesty on Justice: Cf. *Commonwealth v. McHale*, 97 Pa. 397, 406; *Commonwealth v. Havrilla*, 38 Pa. Superior Ct. 292, 295; *Commonwealth ex rel. v. Irvin*, 110 Pa. Superior Ct. 387, 393, 168 A. 868.

*The necessity for an immediate, impartial and speedy investigation* of alleged sale of legislation, widespread graft and corruption, conspiracies and other crimes is not only a matter of public common knowledge in Philadelphia (of which the Courts can take judicial notice) but even more important it is a matter of Court records. The reasons for such a grand jury investigation are set forth at length in my dissent-

ing opinion in *Hamilton Appeal,* 407 Pa. 366, 382-412, and in Judge ALESSANDRONI's opinion dated July 11, 1962, in which he ordered *a special grand jury investigation,* and in District Attorney Crumlish's new petition praying for a grand jury investigation which he presented as recently as *September 14,** 1962, in the Court of Quarter Sessions of Philadelphia County, September Term, 1962. In that petition requesting a grand jury investigation, Crumlish pertinently said:

"At the oral argument before the Supreme Court on September 12, 1962, the necessity for a Grand Jury investigation was not challenged.

"As a result of the Order of the Supreme Court of Pennsylvania on September 13, 1962, refusing to supersede the Order of Court of Common Pleas No. 6 enjoining the further payment of funds, the Special Grand Jury ceased its operations entirely.

*"A Grand Jury investigation is necessary to restore public confidence in City government,** law enforcement and the Judicial system generally* because of:

"(A) The charges and counter-charges about corruption in city government;

"(B) The undermining of public confidence in law enforcement;

"(C) The undermining of public confidence in the ability of the Courts to arrive at judicial decisions without political considerations; . . ."

I would further specifically hold:

(1) The decree issued by Court of Common Pleas No. 6, in an opinion by Judge GOLD—which voided the Orders of Judge ALESSANDRONI without the joinder of indispensably necessary parties who had vital adverse interests, some of whom had petitioned and were re-

---

* Two days after the issue of a grand jury investigation was argued in this Court.

** Italics throughout, ours.

fused permission to intervene—was null and void, and its decree should be vacated!

(2) The Order of Judge ALESSANDRONI as Quarter Sessions Judge, ordering *a special grand jury investigation* of the above mentioned widespread corruption and crime *was never appealed from by anyone, and was valid.*

(3) A grand jury investigation of all the alleged corruption and crime can be made (a) either *by a special grand jury* specially charged to investigate these alleged crimes or (b) by a regular grand jury specially charged to investigate these alleged crimes, even though such regular grand jury is *specially convened prior to its monthly term or held over after its monthly term is ended.*

(4) Under the exceptional circumstances which have developed in these cases, either the Attorney General of Pennsylvania or Court approved counsel can and should conduct these investigations.

(5) In the matter of the *Appeal of D'Ortona et al.* (members of City Council) I agree with the majority that City Council under its resolution could not investigate Griffin. City Council cannot select who may investigate it; it cannot displace, limit, restrict, remove or disqualify Griffin, or compel, directly or indirectly, Judge ALESSANDRONI or any Quarter Sessions Judge to restrict, remove or disqualify Griffin. However, in my judgment, City Council has the right and power to criticize Griffin, subject to the laws of slander and libel, and has the right and power to investigate Griffin at a proper time and *for a legitimate purpose.* Such legitimate purpose would be a consideration of pending or prospective or amendatory legislation,* or future appropriations of money for payment of the costs and expenses of an investigating grand jury proceeding,

---

* Sec. 2-400 of the Philadelphia Home Rule Charter.

even if the underlying motive was to delay or discredit the grand jury investigation.*

Perhaps I should add that I am certainly glad that the majority has strongly recommended what I have long and ardently urged, namely, that the seven separate Courts of Common Pleas of Philadelphia County should be consolidated into one Common Pleas Court with one President Judge. This will obviously expedite litigation, promote Justice and, incidentally, eliminate many confusing situations of which the instant cases are a striking example. However, I believe that some of the majority's criticism of the Common Pleas Judges is unwarranted.

The reasons for each of the aforesaid holdings will be hereinafter set forth in detail and the soundness thereof demonstrated.

Since a number of the principles enunciated by the majority Opinion in my judgment are squarely in the teeth of many decisions of this Court, as well as with approved Court procedures and with Justice, I deem it necessary to review at some length the pertinent facts and the pertinent principles of law which govern these cases and should govern all future grand jury investigations.**

---

* City Council adopted tactics similar to those employed in the *Dauphin County Grand Jury Investigation* cases (infra) of cabinet members and high State officials, by virtue of which the hunted became the hunters and the accusers became the accused. However, Council's investigatory powers for proper purposes are supported in principle by *Dauphin County Grand Jury Investigation Proceedings (No. 2)*, 332 Pa. 342, 344, 2 A. 2d 802; its limitations are delineated in *McGinley v. Scott*, 401 Pa. 310, 322, 164 A. 2d 424.

** The magnitude of the work required in these cases is apparent from the record which totals over 600 pages and the briefs which total more than 250 pages, and the number of prior decisions, text authorities and statutes cited or quoted (plus those discovered by my independent research) which required examination or restudy, exceeded 200.

## Summary of Important Facts

It is important to note at the very beginning that *no appeal was ever taken by anyone from Judge* ALESSANDRONI'S *Orders* (except his Order with respect to City Council which was hereinbefore mentioned and which will be hereinafter more fully discussed). On the contrary, Judge ALESSANDRONI'S Orders were declared null and void (as a result of a collateral attack thereon) by a decision of a Court of co-equal jurisdiction, namely, the Court of Common Pleas No. 6 of Philadelphia County, in an *amicable* taxpayer's suit of which No. 6 Court had absolutely no jurisdiction because none of the indispensable parties (such as White, Griffin and others who had a direct, immediate and pecuniary interest) were joined as parties and even the memorialists were prohibited by Common Pleas Court No. 6 from intervening.

All of these cases and petitions involved or arose out of proposed grand jury proceedings and other proposed investigations of alleged widespread graft, conspiracy, corruption and crime in the high echelons of Philadelphia's municipal government and in City Council and in the Democratic City Committee. They resulted from a barrage of petitions, counter-petitions, charges and counter-charges, as well as delaying and diversionary tactical procedures, many of which were so highly technical, or so obviously political and irrelevant, that they reflected no credit on the bar. Moreover, they undoubtedly, although unintentionally, caused confidence in the Courts as well as in the bar to be *temporarily* diminished, a result which everyone agrees was deplorable. Furthermore, the welter of legal suits, petitions, charges, counter-charges and the conflicting decisions by the Courts of Philadelphia County, produced tremendous confusion and near chaos in the Orderly Administration of Law and Justice. An aura of politics was generated which enveloped all the

cases and successfully hid from public and sometimes from legal view the very important legal questions which were raised in and by the various petitions and suits. In order to dispel this political fog and to bring the important legal questions into proper focus, disentangled from irrelevant facts and arguments and from many highly technical points which, although not controlling, served to becloud the main issues, we shall recite the most important material facts in *chronological* order.

Early in 1961, City Controller Alexander Hemphill unearthed and made public a conspiracy and fraudulent conduct which resulted in a loss to the City of Philadelphia of nearly a million dollars. This was known as the "Frankford El" or Elevated railway scandal. The Philadelphia newspapers thereafter commenced or (continued and) *intensified* their investigations to attempt to discover whether there was widespread graft, corruption and crime in Philadelphia, and if so, to expose the corruption and those involved therein. As a result of their investigations, the newspapers of Philadelphia—all of which were independent, although supporters of the so-called Dilworth City Administration—proclaimed that there was widespread graft, payola, corruption and crime in the City Administration, especially among the higher echelon, and for many months constantly demanded a grand jury investigation. Finally, prominent residents, citizens, electors and taxpayers of Philadelphia, early in June, 1961, filed separate petitions or memorials* alleging

---

* The first petition or memorial was filed by Virginia Knauer and Wilbur H. Hamilton, on behalf of themselves and all other residents, citizens, electors and taxpayers of Philadelphia who might wish to join, and the second petition was filed by Donald C. Rubel, Walter P. Miller, Jr., and other prominent citizens, residents, electors and taxpayers of Philadelphia, and as members of the Republican Alliance.

widespread graft, corruption and crime in the City government and requesting that a special grand jury be convened to make a full and complete investigation of the aforesaid matters. They further averred that "District Attorney James C. Crumlish, Jr. has failed and refused to act despite adequate staff with which to do so," and prayed "that the Court appoint for the purpose of conducting a special investigation an intelligent special prosecutor of high legal standing and ability and of fearless and forthright character."

These petitions were presented to the Quarter Sessions Court of Philadelphia County which was then presided over by Judge ALEXANDER, sitting *in the Miscellaneous Division of that Court.* We note that pursuant to an arrangement and agreement in effect between the 21 Judges of the Courts of Common Pleas of Philadelphia County, each of whom is a member of the Quarter Sessions Court, several Common Pleas Judges are assigned each month to criminal business in the Quarter Sessions Court of Philadelphia County. One Judge supervises the regular monthly grand jury and likewise hears criminal cases in the Quarter Sessions Court in a Court or courtroom known as "Quarter Sessions No. 1." Another Judge presides over the (so-called) "Miscellaneous Division" of the Quarter Sessions Court and hears miscellaneous petitions and matters, and also hears criminal cases (mostly bail cases). This Court is known as "Quarter Sessions No. 4." Criminal trials are also *simultaneously conducted* in other courtrooms in Philadelphia by other Quarter Session Judges. This statement of the customary practice and procedure in Quarter Sessions Court in Philadelphia County is made for the benefit of Judges who are unfamiliar with the practices and procedures in that County, and to make absolutely clear that whether Judge ALESSANDRONI, Judge ALEXANDER or any particular Quarter Sessions Judge presided

over and directed a grand jury investigation *is*— as all the Quarter Sessions Judges of Philadelphia agree—*a matter solely for the internal management of the Quarter Session Judges themselves*. We may add that any decision they might make in this internal management will be reversed by an appellate Court only for fraud.

The District Attorney of Philadelphia, James C. Crumlish, Jr., the then Mayor of Philadelphia, Richardson Dilworth, the President of City Council, James H. J. Tate, and six other city officials who were named as respondents in the aforesaid petitions, filed a *written* answer in which they denied virtually all the charges and *vigorously opposed any grand jury investigation*. The Mayor and the *District Attorney*, and the City Solicitor (as counsel for the Mayor and the District Attorney) also *strenuously opposed any grand jury investigation in oral arguments* before Judge ALEXANDER—and urged the Court to dismiss the petitions on the ground that a grand jury investigation was *entirely unnecessary*. It is important to note, as will hereinafter more fully appear, (a) that Judge ALEXANDER presided in the *Miscellaneous Division* of the Quarter Sessions Court, and (b) his right to decide said petitions after his term therein had expired was acquiesced in by the Judge who presided in Quarter Sessions No. 1 in June and in July, and (c) that *none of the parties-respondents alleged, nor did Judge ALEXANDER hold, that a special grand jury proceeding was unknown to the law or illegal*.

Judge ALEXANDER, after careful consideration of all petitions, answers and oral arguments, dismissed the memorialists' petitions. An appeal from Judge ALEXANDER'S decision was quashed by this Court (in a 4 to 2 decision) upon the ground that the memorialists had no legal standing or right to appeal: *Hamilton Appeal*, 407 Pa. 366, 180 A. 2d 782[2]. Justice JONES, one

of the aforesaid four majority-Justices, filed a concurring opinion in which he agreed with the majority that the appellants lacked any legal standing to take an appeal, *but was convinced that the prayer of the petition should have been granted by Judge* ALEXANDER. Justice COHEN, another one of the four majority-Justices, filed a concurring opinion in which he expressed the opinion that the memorialists had no standing as litigants to petition for a special grand jury in the lower Court or to take an appeal, and that Judge ALEXANDER had no jurisdiction over the grand jury and that the appeal was moot and for this reason should be dismissed. I wrote a lengthy dissenting opinion which was joined in by Justice O'BRIEN, which vigorously asserted (1) that *an investigation by a special grand jury was imperatively needed,* and (2) that Judge ALEXANDER'S decision and opinion were erroneous and were based upon a fundamental misconception of the applicable principles of law, and (3) that a grand jury investigation should have been ordered by Judge ALEXANDER!

It is very important to note, as will hereinafter become strikingly apparent, that in the *Hamilton* case *three of the Justices held that a special grand jury investigation was imperatively needed,* while *no Justice asserted in that case—as the majority now do in this case—that a special grand jury was unknown to the law and could not be convened.* We may further note that neither the City Solicitor nor any of the respondents contended at that time that a *special grand jury* was unknown to the law or illegal.

Thereafter another petition was filed by 13 petitioners or memorialists who were citizens, residents, taxpayers and electors of Philadelphia asking the Quarter Sessions Court of Philadelphia to instruct a *special grand jury* to investigate alleged widespread graft, corruption, conspiracy and crime—by and among high City

officials *and Councilmen* and persons occupying important positions in the Democratic City Committee including, inter alia, the alleged sale of legislation and particularly of zoning ordinances by members of the City Council of Philadelphia—in the light of the new facts and circumstances which were set forth in this new petition.* The petitioners further averred, inter alia, "that there has been *a complete breakdown* on the part of the District Attorney of Philadelphia, James C. Crumlish, Jr., *in performing public duties and functions in this regard.* The said James C. Crumlish, Jr., has in fact wilfully and deliberately failed and refused to vigorously investigate and prosecute the principal wrongdoers involved in this conspiracy between the City Council of Philadelphia and the Democratic City Committee." The petitioners also prayed that special attorneys not connected with the present City or State Administration in any way should be assigned and appointed to conduct this special grand jury investigation. Crumlish filed an answer denying these charges.

In accordance with the custom in Philadelphia County, the petition was presented to the Judge presiding in the *Miscellaneous Division of the Quarter Sessions Court* of Philadelphia County. The Judge who was then presiding in the Miscellaneous Division of the Quarter Sessions Court was Judge CHARLES L. GUERIN. Judge GUERIN fixed April 27, 1962, as the time for a hearing on the petition. The hearing on this petition and on the answer thereto (which was filed by the City Solicitor on behalf of the District Attorney) was held on that date by Judge ALESSANDRONI who succeeded Judge GUERIN and in the month of April was the presiding Judge in the *Miscellaneous Division of the Quarter Sessions Court.*

Judge ALESSANDRONI, after careful consideration, on July 11, 1962, filed an *Order ordering the conven-*

---

\* Sometimes referred to as the Leonard petition.

*ing of a special grand jury* on September 4, 1962, to investigate the aforesaid charges of widespread graft, corruption, conspiracy and crime, particularly with respect to City Council and members of the Democratic City Committee. Judge ALESSANDRONI in his opinion, aptly said:

". . . It cannot be argued that the incidents mentioned above are not serious in nature. There is reasonable ground to believe that the charges have merit and indicate the existence of impropriety at the very core of the government of the City of Philadelphia, the natural and probable effect of which is to undermine the confidence of the public generally. . . .

"We recite the brief summary merely to indicate that the charges of corruption are of a grave nature. The very existence of democratic government by the people is at stake. An indication of the gravity of the situation and perhaps the most serious reflection of all, was a statement by the publicity director of the Democratic City Committee that all questions concerning charges of fraud and 'payola' received by members of City Council would be referred to the City Committee; there they would be screened and if it were deemed desirable the committee would provide answers to the various news media. . . .

"Mere mention of the charges is sufficient indication of the gravity of same. If corruption exists it is not cured merely by a few arrests and prosecution [of several "small fry"]. There is ample reliable evidence to establish at least prima facie the sale of legislation. Unreported contributions coincidental with the passage of legislation or the acceptance of proposed amendments is more than mere suspicion that a quid pro quo is involved.

"That this is a shocking betrayal of the public trust in the officials involved is beyond question. . . .

"When a serious malady afflicts the body politic, a remedy must exist. This is particularly so when for

a number of vital reasons, at least to the opponents of the probe, *the usual petitioner, the District Attorney is unwilling or unable to institute the proceeding. A good reason exists in the instant case when there are reasonable grounds for the belief that elected public officials have been effectively muzzled by the political high command.*

"Upon all of the facts alleged in the petition which give rise to reasonable ground to believe a serious and grave corruption has attacked and infested the government of the City of Philadelphia, we summarize as follows: (1) citizens can petition for the granting of a grand jury investigation; (2) the facts of the petition must be sufficient to support a reasonable belief that crimes have been committed, and we deem the facts to be sufficient; (3) the only pleadings or documents to be considered are the petition [and matters of public knowledge]. We accordingly dismiss the answer and motion to dismiss without further comment.

"We are completely aware of the gravity of the institution of an investigation and we do not reach the conclusion lightly. Our determination is that an investigation must proceed in order that the alleged corruption may be excised from the body politic to the end that the confidence of citizens of Philadelphia may be restored."

Thereafter no opposition was made to Judge ALESSANDRONI'S Order by the District Attorney or by the Mayor or by City Councilmen or by anyone connected with the City Administration; nor was any writ of prohibition filed challenging a grand jury investigation, *or any appeal ever taken therefrom by anyone.**

---

\* Although the question was not raised below, I agree with the majority that the scope of the investigation was too broad. For example, the Republican Alliance has not been accused of any crime and therefore cannot be investigated by a grand jury. Cf. *McGinley v. Scott*, 401 Pa., supra, and *Special Grand Jury Case*,

The next day, July 12th, City Solicitor Berger, on behalf of District Attorney Crumlish and of the City Administration of Philadelphia, publicly announced, and it appears *as a matter of record in these cases* that, despite their previous opposition to a grand jury investigation, (1) they would not further oppose the Order made by Judge ALESSANDRONI, and (2) urged that *the convening of the special grand jury be expedited and* (3) *that "a special counsel of eminence be appointed by the Court"* to formally conduct the investigation. There has been and can be no denial of these facts.

Thereafter, on July 18, 1962, Judge ALESSANDRONI appointed W. Wilson White,* Esq., as special prosecutor, and on July 25, 1962, F. Hastings Griffin, Jr.,* Esq., assistant prosecutor, with directions to conduct the special grand jury investigation in accordance with Judge ALESSANDRONI'S previous Order and Opinion. Thereafter, Judge ALESSANDRONI appeared before City Council and on August 18, 1962, with the assistance of City Solicitor Berger, obtained an appropriation from City Council of $112,000 to cover the estimated cost of the investigation for a period of approximately 6 months. The City Solicitor then collaborated with White in the renting of offices in the Widener Building and in the equipment thereof, and District Attorney Crumlish, in his turn, publicly offered to turn over to White, copies of whatever files White might request.**

---

397 Pa., supra. The scope of the investigation could be properly limited by this Court on an appeal or by a petition for a writ of prohibition. Act of May 20, 1891, Section 2 P. L. 101, 12 P.S. §1164; *Adams v. New Kensington,* 374 Pa. 104, 97 A. 2d 354; *Smith v. Allegheny County,* 377 Pa. 365, 105 A. 2d 137.

* From a panel of attorneys submitted to the Court by the Chancellor and former Chancellors of the Philadelphia Bar Association.

** Needless to say, all of this was both proper and wise.

We repeat: No appeal was ever taken by anyone at any time from the Orders or from any decision by Judge ALESSANDRONI, except his later Order temporarily restraining City Council from investigating Griffin.

This era of cooperation and orderly administration was ended on August 21st when Beatrice Smith, a taxpayer, filed a complaint in the nature of a taxpayer's suit against the City's fiscal officials who were responsible for the payment of city moneys, praying for an injunction restraining them from the payment of any money for the cost of the investigation ordered by Judge ALESSANDRONI.

Beatrice Smith's complaint to enjoin the payment of taxpayers' money was docketed in Court of Common Pleas No. 2 of Philadelphia County, but because that Court was in summer recess the case was referred to Court of Common Pleas No. 6 of Philadelphia County, the so-called summer Court, which at that time was composed of Judges GOLD, KELLEY and BLANC. Since Common Pleas No. 5 and Common Pleas No. 6 were Courts co-equal in stature and jurisdiction, comity would have dictated the transfer of the *Smith* suit by Common Pleas No. 6 to Common Pleas No. 5, as without any doubt it constituted a collateral attack on the decision of Judge ALESSANDRONI, President Judge of No. 5 Court. If that had been done, all the present questions could have been settled on appeal to this Court by the losing parties in No. 5 Court, and all the confusion of conflicting decisions which temporarily impaired public confidence would have been avoided.

Neither the memorialists for a *special grand jury* investigation—which had been allowed by Judge ALESSANDRONI and thereafter approved by the Mayor, the City Solicitor and the City Council of Philadelphia, as aforesaid—nor the prosecutors White and Griffin, and other members of the investigating staff, many of whom had given up permanent jobs in order to aid as

a civic duty in a public investigation of alleged crime and corruption, and who were then owed salaries or wages by the City, were made parties to the suit. If Smith, who had an interest amounting to a few cents or at most a few dollars, was a proper party—as she was—certainly White et al., were proper and necessary parties. Furthermore, when the memorialists filed a petition to intervene,—after being invited by Judge GOLD to do so—their petition was refused by No. 6 Court, with Judge KELLEY wisely dissenting. We also note that Judge GOLD wrote to the Attorney General of Pennsylvania asking him if he wished to intervene or take part in the case. The Attorney General, whose work for the Commonwealth is not only statewide, but tremendous, replied of record declining to intervene.

It is astonishing to note that in this case before No. 6 Court, the City Solicitor "reversed his field" and agreed with Smith, the complainant, that Judge ALESSANDRONI'S actions and Orders which he had theretofore approved, were illegal, null and void.* The net result was that there was no person, party or lawyer to oppose the taxpayer's suit or to protect any of the parties who had a direct, immediate and pecuniary interest in the suit. Common Pleas Court No. 6, in an opinion by Judge GOLD, thereupon entered an Order (1) enjoining the financial officers of Philadelphia from paying any of the money which Council had appropriated as aforesaid for the grand jury investigation and (2) declaring illegal, null and void each and every one of Judge ALESSANDRONI'S aforesaid Orders. Judge GOLD filed the decision of Court of Common Pleas No. 6 on September 5, 1962, and since there was no adversary party to take an appeal, Berger, the City

---

* Knowing Berger, as we do, we believe he acted in accordance with his conscience.

Solicitor, to his credit, immediately took an appeal to this Court.

The Orders and the Decree issued by Court of Common Pleas No. 6 per Judge GOLD were absolutely null and void because of lack of indispensable parties. Neither the memorialists *nor any indispensable parties* were included as parties defendant, nor were the memorialists permitted to intervene in that Court. White, Griffin, and all the members of the investigating staff* had a direct, immediate, substantial and pecuniary interest** in the *Smith* suit—*Hartley v. Langkamp and Elder*, 243 Pa. 550, 555-556, 90 A. 402; *Gardner v. Allegheny County*, 382 Pa. 88, 95, 114 A. 2d 491; *Fineman v. Cutler*, 273 Pa. 189, 116 A. 819; see also: *Keystone Raceway Corporation v. State Harness Racing Commission*, 405 Pa. 1, 173 A. 2d 97; *Ritter Finance Company, Inc. v. Myers*, 401 Pa. 467, 165 A. 2d 246— and consequently were indispensable parties in the *Smith* suit in the Court of Common Pleas No. 6. Judge

---

* These parties should have been made defendants sub nomine, White, Griffin et al.

** The $112,000 appropriation made by Council approved a salary for White for a period of approximately six months at a rate of $20,000 per year and for Griffin at the rate of $17,500 per year, as well as wages for investigators, secretaries, etc. At the time of the decision of Court of Common Pleas No. 6, White had been working since July 18th and Griffin since July 25th without any compensation whatever. As of September 5th and as of September 12th, the date of the argument in this Court, some members of the staff were owed salaries and wages for their services in connection with the investigation. One investigator employed by contract at $150 per week was owed $900. Hence, if the judgment of Court of Common Pleas No. 6 in the *Smith* case should stand, the individuals mentioned will never receive the compensation now owed them under an Order of a Court which was approved by City Council as aforesaid. Moreover, some of these persons had relinquished permanent jobs to render a public service, which the Quarter Sessions Court had ordered and the City Administration had previously approved.

ALESSANDRONI was also an indispensable party according to the petition of District Attorney Crumlish, because he filed a petition for a writ of prohibition against Judge ALESSANDRONI, and also against W. Wilson White.

In *Hartley v. Langkamp and Elder*, 243 Pa., supra, the Court said (pages 555-556) : ". . . 'A party is indispensable when he has such an interest that a final decree cannot be made without affecting it, or leaving the controversy in such a condition that the final determination may be wholly inconsistent with equity and good conscience. That is to say his presence as a party is indispensable where his rights are so connected with the claims of the litigants that no decree can be made between them without impairing such rights. . . . The rule as to indispensable parties is neither technical nor one of convenience; *it goes absolutely to the jurisdiction, and without their presence the court can grant no relief. . . .' "*

In *Gardner v. Allegheny County*, 382 Pa., supra, the Court said (pages 95-96) : ". . . In Fineman v. Cutler, 273 Pa., supra, the Court said (page 193) : ' "One must be joined who otherwise, not being bound by the decree, might assert a demand . . . which would be inequitable after the performance of a decree in favor of the plaintiff"; and, again "A party is indispensable when he has such an interest that a final decree cannot be made without affecting it or leaving the controversy in such a condition that the final determination may be wholly inconsistent with equity and good conscience"; . . .' "

It is well settled law that No. 6 Court had no jurisdiction and its orders and decrees must be vacated for lack of indispensable parties: *Reifsnyder v. Pittsburgh Outdoor Adv. Co.,* 396 Pa. 320, 152 A. 2d 894; *Powell v. Shepard,* 381 Pa. 405, 412, 113 A. 2d 261; *Dozor Agency v. Rosenberg,* 403 Pa. 237, 240, 169 A.

2d 771; *Insurance Company of the State of Pennsylvania v. Lumbermens Mutual Casualty Company,* 405 Pa. 613, 617, 177 A. 2d 94; *Keystone Insurance Company v. Warehousing and Equipment Corporation,* 402 Pa. 318, 165 A. 2d 608; *Geesey v. City of York,* 254 Pa. 397, 99 A. 27; *Hartley v. Langkamp and Elder,* 243 Pa., supra.

In *Reifsnyder v. Pittsburgh Outdoor Adv. Co.,* 396 Pa., supra, the Court said (page 326) : "Plaintiff's failure to join these indispensable parties in the present suit leaves a Court of Equity without jurisdiction to grant the relief prayed for or any substantial relief whatever, and the appeal must be quashed.

"In Powell v. Shepard, 381 Pa. 405, 113 A. 2d 261, the Court said (page 412) : 'The absence of indispensable parties "goes absolutely to the jurisdiction, and without their presence the court can grant no relief": Hartley v. Langkamp and Elder, 243 Pa. 550, 556, 90 A. 402. . . . And, a party is indispensable where his rights are so connected with the claims of the litigants that no decree can be made between them without impairing such rights: . . .'

"In Hartley v. Langkamp and Elder, 243 Pa. 550, 90 A. 402, the Court said (page 556) : 'It is a settled rule of equity jurisprudence that as the absence of an indispensable party goes to the jurisdiction of the court, an objection to the proceeding on that ground may be raised at any time, during the hearing or on an appeal from the decree of the trial court . . .'."

The majority can not escape by any glossing over this question of indispensable parties and the dozen cases of the Court which answer it—adversely to the majority. How often does this Court have to establish and iterate and reiterate a principle of law before it becomes the established law of Pennsylvania?

It is clear, therefore, that the Orders and Decree of the Court of Common Pleas No. 6 of Philadelphia

County are null and void, with the result that the Orders made by Judge ALESSANDRONI as hereinabove mentioned, directing a special grand jury investigation, *from which no appeal was ever taken by anyone, were in full force and effect and could not be challenged in the Smith suit.* It follows that the only proper Order which this Court can make in the *Smith* suit is to vacate the Orders and the Decree made by the Court of Common Pleas No. 6.

However, the questions raised and involved in these cases are so important for the protection of the people of Philadelphia, and likewise for the clarification of all future grand jury investigations or proceedings, that I will assume arguendo that all indispensable parties had been joined.

It is contended that Court of Common Pleas No. 6 had neither the jurisdiction nor the power to consider the *Smith* complaint or to invalidate the Orders of Judge ALESSANDRONI because the *Smith* bill in equity constituted a collateral attack upon the Orders and judgment of the Quarter Sessions Court made as aforesaid by Judge ALESSANDRONI. The general rule is that where a Court of Quarter Sessions or any Court has jurisdiction of the subject matter and of the parties, an order or judgment which it makes is not subject to review in a collateral proceeding in a Court of Common Pleas *or in any Court of coordinate jurisdiction*: *Northrup v. Pike Township,* 242 Pa. 1, 88 A. 781; *Moeller v. Washington County,* 352 Pa. 640, 644, 44 A. 2d 252; *Tenth National Bank v. Construction Co.,* 227 Pa. 354, 76 A. 67; *Doyle v. Commonwealth,* 107 Pa. 20 (where the Court said, "[If] one court can modify or set aside the judgment of another court of co-ordinate jurisdiction . . . the most deplorable consequences would likely ensue.") ; *Kennedy v. Baker,* 159 Pa. 146, 28 A. 252; *In re Gottesfeld,* 245 Pa. 314, 91 A. 494; *Dauberman v. Hain,* 196 Pa. 435, 46 A. 442; *Plains Township's*

*Appeal,* 206 Pa. 556, 56 A. 60; *Haines v. Hall,* 209 Pa. 104, 58 A. 125; *Randal v. Gould,* 225 Pa. 42, 51, 73 A. 986.

While there is no doubt about the general rule, I believe there is and should be one or more exceptions thereto, and one of these exceptions is a taxpayer's suit to restrain the payment of money* by a municipality provided, of course, that indispensable parties were joined or appeared therein. I would therefore hold that this general rule would not *of itself* oust the jurisdiction or invalidate the decree of Court of Common Pleas No. 6.

Many decisions of this Court hold that the right to office of de jure and de facto officers cannot be tested or invalidated by injunction or mandamus or by any action except an action of quo warranto: *Pleasant Hills Borough v. Jefferson Township,* 359 Pa. 509, 59 A. 2d 697; *Brinton v. Kerr,* 320 Pa. 62, 181 A. 569; *Commonwealth ex rel. v. Gibson,* 316 Pa. 429, 434, 175 A. 389; *Williams's Appeal,* 312 Pa. 477, 167 A. 587; *Commonwealth ex rel. Palermo v. Pittsburgh,* 339 Pa. 173, 178, 13 A. 2d 24; *Commonwealth v. Snyder,* 294 Pa. 555, 559, 144 A. 748; *Commonwealth v. Blume,* 307 Pa. 406, 413-14, 161 A. 551. See also to the same effect: *Spencer v. Snedeker,* 361 Pa. 234, 64 A. 2d 771. In *Pleasant Hills Borough v. Jefferson Township,* 359 Pa., supra, Mr. Justice (later Chief Justice) STERN said (pages 512-513):

". . . A person in possession of an office and discharging its duties under the color of authority,—that is, authority derived from an election *or appointment however irregular* or informal, so that the incumbent be not a mere volunteer,—is a de facto officer, and his acts are good so far as respects the public; attacks up-

---

* Another familiar exception is a habeas corpus proceeding which attacks the validity of a petitioner's conviction and/or sentence in a criminal case.

on the right of such incumbent to serve must be instituted by the Commonwealth in a direct proceeding for that purpose and cannot be made collaterally: King v. Philadelphia Co., 154 Pa. 160, 168, 169, 26 A. 308, 309, 310; Krickbaum's Contested Election, 221 Pa. 521, 526, 527, 70 A. 852, 854; Commonwealth ex rel. Raker v. Snyder, 294 Pa. 555, 559, 144 A. 748, 749; Commonwealth ex rel. Palermo v. Pittsburgh, 339 Pa. 173, 177, 178, 13 A. 2d 24, 26; Commonwealth ex rel. McCreary v. Major, 343 Pa. 355, 364, 22 A. 2d 686, 690, 691; Commonwealth v. Brownmiller, 141 Pa. Superior Ct. 107, 112, 113, 14 A. 2d 907, 910."

It would appear that White and Griffin are de facto officers and come within the foregoing authorities. However, I make no decision on this point because I prefer, in view of the very important public questions involved, to place my decision on broader grounds.

I therefore turn next to a consideration of Judge ALESSANDRONI's Orders which Court of Common Pleas No. 6 enjoined and decreed to be null and void. Philadelphia County, unlike any other County in the State, convenes a (so-called regular) Grand Jury *every month*. Other Counties have a regular Grand Jury convene three or four times a year, and the term of service of these jurors usually extends for a period of three or four months. Those who are unfamiliar with the practices and procedures in Philadelphia County which are necessitated by the tremendous number of crimes which occur monthly, fail to realize (a) the functions and the enormous amount of work performed by a regular *monthly* grand jury in Philadelphia County; and (b) the necessary assignment of several Judges to dispose of this enormous volume of criminal cases and miscellaneous criminal matters which must, whenever reasonably possible, be tried or heard each month. There is no such problem and there are no such divisions of the Quarter Sessions Courts in any other County in the

State, and no unbiased person who is conversant with practices and procedures in Philadelphia County would question Judge ALESSANDRONI'S hearing and right to determine the memorialists' petition which was presented to the Miscellaneous Division of the Quarter Sessions Court over which he presided in April, 1962. This was, we repeat, a matter of internal management of the Quarter Sessions Court by the 21 Quarter Sessions Judges of Philadelphia County. As Judge GOLD, speaking for the Court of Common Pleas No. 6, so aptly said "After careful consideration [of the fact that Judge ALESSANDRONI did not preside by "designation" in the Court of Quarter Sessions during the months of May, June, July or August and had not been "designated" to preside as a Judge in said Court during the month of September] we conclude that he had such right [to consider and determine the petition of the memorialists], although . . . for the reasons stated in this opinion, that there is no authority in law which supports the orders [for a *special* grand jury investigation or for the appointment of special prosecutors] which the Court made.

. . .

"The fact that Judge ALESSANDRONI had not been designated to sit in any of the several Quarter Sessions Courts subsequent to April, 1962 did not prevent him, after hearing on the petition, to defer his adjudication until later, when [after careful and necessary study of the very many important legal questions involved] he had come to a decision [on the issues raised].

"Motions and petitions, deferred adjudications and sentences, which have been before a judge sitting as a designated judge in a Court of Quarter Sessions may be and are disposed of later when he is no longer sitting as a designated judge. [The volume of trials, arguments and miscellaneous matters in Philadelphia County make this absolutely necessary in the orderly

administration of law and Justice]. He is still a judge of Quarter Sessions.

"In re Kensington v. Oxford Turnpike Road Company, 12 Phila. 611, at 617, it is said: 'That the cause is in the Court of Quarter Sessions of the county is not denied. What particular judge or judges hold that court, if duly commissioned, is of no importance to any one save the judges themselves .... The several courts, therefore, as the public business demands, detail one or all of their number to hold said court. The public or suitors, therefore, have nothing to do with the schedule or assignments of the judges to hold said courts. It is made by the judges for the convenience of the general business of all the four (now seven) courts, and may be changed at any moment.'

"See also Commonwealth v. Green, 126 Pa. 531 at page 540 (1889), [which, we note, amply supports the *Kensington* case, supra, and Judge GOLD's position on this point.]

"Therefore, for the reasons stated, we hold that Judge ALESSANDRONI *lawfully considered the memorial* for an investigation by a grand jury presented to Judge GUERIN on March 22, 1962, and by the latter turned over to Judge ALESSANDRONI as his designated successor in Quarter Sessions Court No. 4 for April 1962."

A "Special" Grand Jury Is a Lawful Body

The majority hold that there is no body known to the law as a *special grand jury,* and if we understand their opinion correctly two Grand Juries cannot exist and operate simultaneously. This is so contrary to realities and to many prior decisions of this Court that it seems incomprehensible. The majority admit, as they must, (1) that a regular monthly grand jury could investigate, *if specially charged* by the presiding Quarter Sessions Judge, the charges made in the memorial-

ists' petition before Judge ALESSANDRONI and (2) that such an investigating jury can be convened in advance and/or can be held over for many months after its term of regular monthly service was ended, and (3) that such jury could continue to investigate these charges for many months after its regular monthly term ended. All of these propositions were specifically approved in *Shenker v. Harr*, 332 Pa. 382, 2 A. 2d 298, and we repeat are admitted by the majority of the Court. The majority likewise agree with me that after the monthly term of a regular grand jury is ended it becomes thereafter a *special investigating Grand Jury* which presents its findings, recommendations and reports or presentments to the Quarter Sessions Court for subsequent consideration by the then functioning or subsequently convened regular monthly Grand Jury which is, as we all know, the *indicting* Grand Jury.

A regular Grand Jury is both an indicting and an investigating grand jury. It considers evidence to determine whether to find a true Bill of Indictment or ignore a Bill of Indictment against persons accused of crime, and it also investigates anything and everything which the presiding Quarter Session Judge may direct. However, we repeat, only the so-called regular Grand Jury can indict *during its term,* and if a particular grand jury holds over thereafter for investigation purposes it can continue its investigation and report its findings and presentments, but it cannot indict. The only difference—absolutely the only difference—between such an investigating regular grand jury and the special investigating grand jury which was convened in this case, is that in this case *a special venire* of jurors was convened *with the sole purpose* of investigating the charges set forth in the memorialists' petition.

The majority rely upon the Act of March 18, 1875, as amended by the Act of April 27, 1927, P. L. 420,

Section 2, 17 P.S. §1351, which provides that a grand jury may be summoned to meet at such time *prior to the holding of its term* that the Judges of the Quarter Sessions Court shall deem expedient, and "may be detained for an additional week without the issuing of a new venire" and may be held over "until the grand jury of the next succeeding term is assembled . . . ." It is clear that this is directory and not mandatory or exclusionary. For example *Shenker v. Harr*, 332 Pa., supra, and other authorities hold, and the majority Opinion concedes that even a so-called regular monthly grand jury may be summoned in advance *and if its investigation is not completed may be held over for a reasonable period of time to terminate its labors\** *—not only until the grand jury of the next succeeding monthly term is assembled, but may be held over* after numerous monthly grand juries have been assembled and their terms have expired.

In *Shenker v. Harr,* supra, the Court said :\*\*

"The question here presented is whether a grand jury, convened for a regular term of court, can continue to function as to uncompleted business beyond such term and remain in session concurrently with grand juries summoned for succeeding regular terms. . . .

"Even, however, if these acts [Act of March 13, 1867, Act of March 18, 1875, Amendatory Act of April 27, 1927] were to be construed as fixing a time limit upon the session of a grand jury for *all* purposes, their provision to that effect must be considered as directory and not mandatory. . . .

"Plaintiff contends that if a grand jury functions during an adjourned session of the court after a succeeding regular term has brought with it the conven-

---

\* In *Shenker v. Harr* the investigating grand jury was permitted to continue its investigations for 14 months.

\*\* A unanimous opinion written by Justice, later Chief Justice, HORACE STERN.

ing of another grand jury, the result will be that two grand juries will be operating in the county at the same time. Neither in law nor from a practical standpoint, however, is there any serious objection to such a situation."*

I also note that the majority rely upon the Act of March 13, 1867, P. L. 420, 17 P.S. §472. This requires the convening of 24 grand jurors for each regular (monthly) session of the Quarter Sessions Court of Philadelphia County. This has always been considered to be directory and non-exclusive. Were it otherwise, a grand jury often could not act, because, inter alia, of the fact that so many grand jurors would or might be excused for legitimate reasons, with the result that less than 13 grand jurors might be available for duty. Such a grand jury would be legally inadequate, with the result that a new venire would have to be summoned. How it is possible for the majority to ignore these realities, I do not understand.

To repeat, the majority holds that a grand jury, meaning a regular monthly grand jury, can be validly convened prior to its term for the special purpose of charging it to investigate alleged widespread corruption and crime and can be validly held over for months thereafter to complete its investigation. The majority then holds that a *special grand jury* cannot be validly convened for the special purpose of charging it to investigate alleged widespread corruption and crime and cannot be validly held over for months thereafter to complete its investigation.

What a difference there can be 'twixt tweedle-dum and tweedle-dee.

Assuming that there is a material difference between tweedle-dum and tweedle-dee, the realities and

---

* I note further that the Courts have repeatedly approved such procedure and the presentments made by such a grand jury.

the prior decisions of this Court legalize, support and justify a *special grand jury.*

## Realities

The realities of Court business in Philadelphia make *a special grand jury* (under exceptional circumstances) *absolutely necessary.* One of the advantages of a special grand jury proceeding and one of the customary results is that the investigation which is made by a special grand jury—and because of the lack of time usually cannot be made by a regular monthly grand jury—is the ferreting out of crime and criminals which the ordinary processes of the law cannot readily discover or adequately cope with.

A regular grand jury, we repeat, hears witnesses and thereafter decides whether a prima facie case of a crime exists, and on that basis finds or ignores a Bill or Bills of Indictment. A regular Grand Jury likewise investigates any matter which the presiding Quarter Sessions Judge directs it to investigate. In the year 1961, the *regular monthly* grand jury in the County of Philadelphia considered an average of 1828 bills of indictment which were presented, together with supporting witnesses, by the District Attorney and his staff. Of these 1828 monthly bills, the grand jury finds on the average 1668 true bills every month, and ignores approximately 160 bills. Furthermore, the regular monthly grand jury is, we repeat, under a duty to investigate whatever matters the presiding Judge of the Quarter Sessions Court directs. If, in addition to all of this—hearing witnesses, indicting persons accused of crime, and investigation of whatever matters the Judge directs—*a regular monthly grand jury* would have to investigate in Philadelphia the charges of widespread corruption and crime throughout the City, indictments and trials of criminals will be grievously retarded, witnesses will become lost or move, their recol-

lection may become hazy or obscured, *statutes of limitation may run,* and criminals will have further opportunity to "cover their tracks". *The net result would be that protection of law abiding citizens would be further weakened and Justice not only delayed but jeopardized.* A law abiding community can be protected from criminals only by an adequate police force and the speedy arrest, indictment, trial and conviction of criminals, and the prompt and adequate sentencing of them by the Courts. The crime wave in Philadelphia and the backlog of untried criminal cases is alarming; moreover, crimes and backlog are constantly increasing. On September 1, 1961, there was a backlog of untried criminal indictments in Philadelphia County of approximately 12,700. On September 1, 1962, the backlog of untried criminal indictments was nearly 17,-000. To require a regular *monthly* grand jury to hear witnesses and dispose of approximately 1800 or more bills of indictment each month, and at the same time to specially investigate whatever the presiding Quarter Sessions Judge may direct, and *also* to investigate for a four to six months period charges of widespread graft, corruption and crime in the higher echelons of Philadelphia's government, *is so impractical and unrealistic as to be fantastic.*

### Prior Decisions Approve a Special Grand Jury Investigation

However, even if realities are ignored, the prior decisions of this Court and of the Superior Court which have approved time after time a *special grand jury investigation* can not be ignored or repudiated, if speedy Justice and the certainty and stability of the Law are to prevail in Pennsylvania.

A *special grand jury investigation* of alleged widespread corruption and crime was approved in *Dauphin County Grand Jury Investigation Proceedings (No. 1),*

332 Pa. 289, 2 A. 2d 783; in *Special Grand Jury Case,* 397 Pa. 254, 154 A. 2d 592; in *Commonwealth v. Evans,* 190 Pa. Superior Ct. 179, 196, 154 A. 2d 57; in *Shenker v. Harr,* 332 Pa., supra; in *Commonwealth v. Hershman,* 171 Pa. Superior Ct. 134, 90 A. 2d 314; in *Commonwealth v. Antico,* 146 Pa. Superior Ct. 293, 312, 22 A. 2d 204; in *Commonwealth v. Brownmiller,* 141 Pa. Superior Ct. 107, 14 A. 2d 907; in *Commonwealth v. Soloff,* 175 Pa. Superior Ct. 423, 107 A. 2d 179; in *Commonwealth v. Gross,* 172 Pa. Superior Ct. 85, 92 A. 2d 251; and in *Manko Appeal,* 168 Pa. Superior Ct. 177, 77 A. 2d 700.

In *Special Grand Jury Case,* 397 Pa., supra, in *Commonwealth v. Gross,* 172 Pa. Superior Ct., supra; in *Commonwealth v. Evans,* 190 Pa. Superior Ct., supra; in *Commonwealth v. Soloff,* 175 Pa. Superior Ct., supra; in *Commonwealth v. Hershman,* 171 Pa. Superior Ct., supra; and in *Manko Appeal,* 168 Pa. Superior Ct., supra, "*a special investigating grand jury was convened.*" In the other cases, supra, the so-called regular Grand Jury was convened before its term and/or held over long after its term, and in all these cases such jury was known and referred to by this Court or by the Superior Court as a *special grand jury*—and its powers and duties thereafter were limited as in the instant cases to investigation without power of indictment—and the validity of the acts of such jury, although vigorously challenged, was sustained by this Court or by the Superior Court.

In *Special Grand Jury Case,* 397 Pa. 254, 154 A. 2d 592, Judge GOLD—who now asserts there is no such body as a *special Grand Jury*—convened "a *Special Grand Jury* . . . to investigate certain alleged criminal situations" existing in the ranks of Local 107 of the International Brotherhood. This Court issued a writ of prohibition directing Judge GOLD "to discharge the *Special Grand Jury* convened by him on September 3,

1959"—not because a special grand jury was unknown or illegal, but only because the petition for an investigation did not support any allegation of widespread crime. Moreover, the Court specifically recognized the validity and legality of an investigation by a *special grand jury* when it said (pp. 260, 261), "We do not condone the acts darkly suggested in the petition, and we do not say that if the situation worsens *a special grand jury* may not properly be convened to investigate it. . . ." ". . . [A] writ of prohibition is issued, directed to the Honorable JOSEPH E. GOLD and requiring him forthwith to discharge the *Special Grand Jury* convened by him on September 3, 1959, to investigate Local 107 and to terminate all proceedings in connection with it."

In *Dauphin County Grand Jury Investigation Proceedings (No. 1)*, 332 Pa., supra, which was probably the most bitterly fought grand jury investigation in the history of the Commonwealth, this Court, speaking through Mr. Chief Justice KEPHART, said (page 293) : "On April 29, 1938, the District Attorney of Dauphin County, on the eve of a primary election, presented to the Court of Quarter Sessions of that county, a petition requesting that a *special grand jury be convened* to investigate charges made during the campaign against certain public officials and private individuals." And (on page 298) : "The genesis of this call for the *special grand jury* was the petition or suggestion of the District Attorney."

In *Commonwealth v. Hershman*, 171 Pa. Superior Ct., supra, the Court said (page 135) : "On petition of the Attorney General of the Commonwealth the Court of Quarter Sessions of Allegheny County directed that a *special grand jury* be impaneled to investigate alleged lack of law enforcement in certain boroughs within the County of Allegheny."

In *Commonwealth v. Gross,* 172 Pa. Superior Ct., supra, the Court said (pages 88-89) : "The presentment was prepared and filed by a *special investigating grand jury* summoned upon the petition of the Attorney General of Pennsylvania, . . ."

In the exceptionally bitterly fought case of *Commonwealth v. Evans,* 190 Pa. Superior Ct., supra, (which was afterwards affirmed by this Court in 399 Pa. 387), the record shows the following prayer in the petition which was presented by the Attorney General of Pennsylvania to the Quarter Sessions Court of Dauphin County:

"Wherefore, your petitioner [Attorney General, now Justice HERBERT B. COHEN] prays that this Court make an Order directing a *Special Grand Jury** to be convened and to have summoned before it such witnesses as it may require for making a complete and full investigation of the aforesaid matters and making a full report thereof to this Court, reserving unto petitioner the right to expand and enlarge upon the scope of said Grand Jury investigation by supplemental petition or petitions to be presented to this Court."

Following an investigation by the Special Grand Jury which was convened in accordance with such prayer, the Dauphin County Quarter Sessions Court entered the following order:

"AND NOW, January 21, 1957, the District Attorney is herewith directed to prepare and submit to the regular January, 1957 Grand Jury now in session, bills of indictment *covering all the matters contained in the*

---

\* Justice HERBERT B. COHEN and Thomas McBride, Esq., who succeeded him as Attorney General of Pennsylvania and conducted with the District Attorney the investigations made by the Special Grand Jury, and who is now counsel for the Democratic City Committee, now assert that there is no such body known to the law as a *special grand jury.*

*presentment of the Special Grand Jury of Investigation* made to the Court on Friday, January 18, 1957."

. In the opinion of the Superior Court, President Judge RHODES, speaking for the Court, said (page. 196):

' "1. The Validity of the Indictments.

"On October 22, 1956, upon the petition of the Attorney General of. the Commonwealth, [Herbert B. Cohen] dated September 1, 1956, in which the District Attorney of Dauphin County had joined, *a special investigating grand jury was convened.* The matters disclosed by the presentment of the investigating grand jury formed the basis for the bills of indictment submitted,. at the direction of the Court, to the regular grand jury for the January Sessions of 1957. On January 23, 1957, the regular grand jury returned indictments against the nine defendants, five of whom have appealed after conviction, and four of whom were acquitted. . . .

. . .

"*A further consideration is that the investigating grand jury and the indicting grand jury are separate legal bodies.* Although both may have considered the same alleged crimes involving the same individuals, their proceedings, deliberations, and presentments are distinct. Extraneous matters affecting one may not influence the other, and irregularities before one are not always present in the other; the two bodies are unrelated in this respect. Consequently, an indictment by a regular grand jury is not necessarily tainted by some irregularity or improper influence alleged to have affected the investigating grand jury . . . ."

In *Commonwealth v. Antico,* 146 Pa. Superior Ct., supra, which involved indictments charging conspiracy to violate the provisions of the Election Code, the Court said (pages 312-313):

"Special Grand Jury Investigation

"The questions raised concerning the propriety of the court's ordering a *special grand jury* investigation and the conduct of the same, as bearing on the trial now under consideration, are disposed of adversely to appellants in the recent opinions in Com. v. Brownmiller, 141 Pa. Superior Ct. 107, 14 A. 2d 907; Com. v. Kirk et al., 141 Pa. Superior Ct. 123, 14 A. 2d 914; affirmed, 340 Pa. 346, 17 A. 2d 195; McNair's Petition, 324 Pa. 48, 187 A. 498; Com. v. Brownmiller, 137 Pa. Superior Ct. 261, 267, 9 A. 2d 155, 158, and the cases cited in them. The offenses charged dealt with matters of a grave public nature of importance to the well-being of the Commonwealth. *They were peculiarly proper for investigation by a special grand jury* and for the presentation by the district attorney of bills of indictment as directed by the grand jury."

In *Manko Appeal,* 168 Pa. Superior Ct., supra, the Superior Court, speaking through Judge, later Justice, ARNOLD, said (page 178): *"A special investigating grand jury* was summoned in Allegheny County upon the petition of the Attorney General of Pennsylvania . . . ."

How often does this Court and the Superior Court have to assert, establish, iterate and reiterate a proposition for it to be recognized and maintained as the law of Pennsylvania? How can lower Court Judges and public officials know their powers and limitations, how can law abiding citizens be protected, how can men safely make contracts or deeds or wills, if the law or its meaning is frequently changed?

A District Attorney May Be Superseded When Certain Unusual Circumstances Exist and the Interests of Justice Require It

Special or unusual or extraordinary circumstances exist and the interests of Justice require supersession

of a District Attorney, for example whenever a District Attorney is ill, or too complacent or lazy or incompetent, or mistaken about the law or his powers or duties, or should be disqualified because of a personal or family or legal interest, or where it reasonably appears that his failure to promptly take appropriate and adequate action is due to political considerations or close political ties, or whenever for any reason whatsoever his failure or refusal to act promptly, impartially and adequately will likely result in imperiling the public interest and jeopardizing Justice. Where any of these unusual or extraordinary conditions exist, a District Attorney can be superseded (1) by the proceedings authorized by statute* and/or (2) by the Attorney General of Pennsylvania under his broad common law powers and/or (3) by Court appointed counsel under the inherent power and right of a Court to protect the law abiding community and to preserve and promote Justice. It is astonishing that the well established principles of law set forth in (2), supra, have been challenged by the District Attorney and by the City Solicitor and by the Democratic City Committee, and by others in spite of the many decisions of the Supreme Court of Pennsylvania which have sustained and reaffirmed these principles and many times rejected the same contentions which are made by the present District Attorney. The District Attorney's contentions are based fundamentally on the proposition that since the District Attorney is a constitutionally ordained officer who is elected by the people, he can *never* be superseded as to *any* of his functions except under Section 907 of the Administrative Code or by the Act of May 2, 1905.

---

* Article IX, Section 907 of the Administrative Code of April 9, 1929, P. L. 177, 71 P.S. §297, or the Act of May 2, 1905, P. L. 351, 71 P.S. §§817, 818.

## Supersession by Statute

Legislative Acts providing for supersession of a District Attorney under certain circumstances have been sustained over vigorous protests by a District Attorney: *Commonwealth v. McHale,* 97 Pa. 397; *Commonwealth v. Havrilla,* 38 Pa. Superior Ct. 292; *Commonwealth ex rel. v. Irvin,* 110 Pa. Superior Ct. 387, 168 A. 868.

In *Commonwealth v. McHale,* 97 Pa., supra, the Court said (page 406) : "It was urged, however, that the indictments were properly quashed because not signed by the district attorney. They were signed by Guy E. Farquhar, Esq., who was specially appointed by the court to try these cases, under the Act of 12th March 1866, Pamph. L. 85. The appointment appears to have been regularly made in accordance with the provisions of said act, and was eminently proper, as the district attorney was a candidate at the general election at which the alleged frauds were committed, and which frauds, it is stated, increased his vote. It would therefore have been a breach of professional and official propriety for him to have acted as district attorney in these cases. But it is said the appointment was illegal because the Constitution adopted since the act of 1866 was passed, makes the district attorney a constitutional officer, and as such he cannot be stripped of his powers by the legislature. There is little force in this suggestion. While the legislature may not abolish the office, it can control the officer. They can regulate the performance of his duties, and punish him for misconduct, as in the case of other officers. And where he neglects or refuses to act, or where, from the circumstances of a given case, it is improper and indelicate for him to act, it is competent for the legislature to afford a remedy. This is all that the Act of 1866 does, and we think its provisions are not obnoxious to any constitutional provision."

Supersession of District Attorney by Attorney General
Under and by Virtue of the Broad Common Law
Powers of the Attorney General

Even more astonishing is the present contention of
the District Attorney and the City Solicitor and coun-
sel for the Democratic City Committee and others that
an Attorney General, unless specifically authorized by
statute, has no power to supersede a District Attorney.
This contention has been rejected and dismissed over
and over and over again by this Court. See the follow-
ing cases which are specifically and directly in point
and in the clearest language reject and refute the Dis-
trict Attorney's contentions: *Commonwealth ex rel.
Minerd v. Margiotti*, 325 Pa. 17, 30, 188 A. 524;
*Dauphin County Grand Jury Investigation Proceedings
(No. 1)*, 332 Pa. 289, 298, 2 A. 2d 783; *Dauphin
County Grand Jury Investigation Proceedings (No. 3)*,
332 Pa. 358, 362, 2 A. 2d 809; *Matson v. Margiotti*,
371 Pa. 188, 200, 88 A. 2d 892; *Margiotti Appeal*, 365
Pa. 330, 332, 75 A. 2d 465; *Commonwealth ex rel.
Margiotti v. Orsini*, 368 Pa. 259, 261, 81 A. 2d 891;
and *Commonwealth v. Fudeman*, 396 Pa. 236, 238,
152 A. 2d 428.

In *Commonwealth ex rel. Margiotti v. Orsini*, 368
Pa., supra, the Court said (pages 260, 261-262) : "The
Attorney General of Pennsylvania superseded the Dis-
trict Attorney of Allegheny County in the investigation
of alleged widespread criminal activities in that Coun-
ty and in the direction and control of a grand jury in-
vestigation of alleged violations of the law by pub-
lic officials and public employees. The supersession of
the District Attorney by the Attorney General in that
particular matter was sustained by this Court in Mar-
giotti Appeal, 365 Pa. 330, 75 A. 2d 465.

. . .

". . . The authority of the Attorney General to in-
vestigate criminal acts is clearly set forth in Com. ex

rel. Minerd v. Margiotti, 325 Pa. 17, 188 A. 524; Dauphin County Grand Jury Investigation Proceedings (No. 1), 332 Pa. 289, 2 A. 2d 783; Margiotti Appeal, 365 Pa. 330, 75 A. 2d 465. In Com. ex rel. Minerd v. Margiotti, 325 Pa. 17, supra, Mr. Justice SCHAFFER said (pages 30, 31) : 'We conclude from the review of decided cases and historical and other authorities that the Attorney General of Pennsylvania is clothed with the powers and attributes which enveloped Attorneys General at common law, including the right to investigate criminal acts, to institute proceedings in the several counties of the Commonwealth, to sign indictments, to appear before the grand jury and submit testimony, to appear in court and to try criminal cases on the Commonwealth's behalf, *and, in any and all these activities to supersede and set aside the district attorney* when in the Attorney General's judgment such action may be necessary.'* In Margiotti Appeal, 365 Pa. 330, supra, this Court quoted with approval the following language from the opinion of Dauphin County Grand Jury Investigation Proceedings (No. 1), 332 Pa. 289, supra, (page 298) : 'But the Attorney General, with his vast powers, recognized by this Court in Commonwealth ex rel. v. Margiotti, 325 Pa. 17, may supplement and supervise the grand jury in any investigation; he may,—*and it is his duty to do so if he believes the government is to be hindered in the lawful conduct of its affairs to the detriment of the security, peace and good order of the State,—supersede the District Attorney in the conduct of the entire investigation. . . .' "*

In the recent case of *Commonwealth v. Fudeman*, 396 Pa., supra (1959), the Court said (pages 238-239) : "There is no doubt that under the common law and the

---

* Of course the Attorney General's judgment as to the necessity for supersession is subject to review by this Court for an abuse of discretion.

statutory* and decisional law of Pennsylvania, the Attorney General has the power and, under certain circumstances, the duty to investigate any violations or alleged violations of the laws of the Commonwealth and to supplement and supervise a Grand Jury, *and he may, under proper circumstances, supersede* or act in conjunction with a district attorney.

"In Matson v. Margiotti, 371 Pa. 188, 88 A. 2d 892, the Court pertinently said (pages 200-201) : ' "We conclude from the review of decided cases and historical and other authorities that the Attorney General of Pennsylvania is clothed with the powers and attributes which enveloped Attorneys General at common law, including the right to investigate criminal acts, to institute proceedings in the several counties of the Commonwealth, to sign indictments, to appear before the grand jury and submit testimony, to appear in court and to try criminal cases on the Commonwealth's behalf, *and, in any and all these activities to supersede and set aside the district attorney* when in the Attorney General's judgment** such action may be necessary."

" 'These vast powers of the Attorney General were further recognized in our opinions in Dauphin County Grand Jury Proceedings No. 1, 332 Pa. 289, 298, 2 A. 2d 783; in Dauphin County Grand Jury Proceedings No. 3, 332 Pa. 358, 362, 2 A. 2d 809; in Margiotti Appeal, 365 Pa., [330], and in Com. ex rel. Margiotti v. Orsini, 368 Pa., [259], in each of which we reiterated that the Attorney General may supplement and supervise a grand jury *and may under proper circumstances supersede or act in conjunction with a district attorney;* and then said: ". . . and it is his duty to do so if

---

"* The Administrative Code of 1929, P. L. 177, §904, 71 P.S. §294.

** The reasonable exercise of which is subject to judicial review." ,

he believes the government is to be hindered in the lawful conduct of its affairs to the detriment of the security, peace and good order of the State . . . ." ' "

Furthermore, the Statutory and Common Law power of the Attorney General to supersede a District Attorney was recognized and *reasserted* by the present Attorney General of Pennsylvania. Attorney General David Stahl said in his letter in reply to Judge GOLD, who asked him to intervene in this very case: "In my opinion [the] adjudication could in no way affect or detract *from the statutory and common law powers* of the Attorney General, *particularly the authority to supersede and set aside a District Attorney* in proper cases or the discretionary power to appoint special counsel in criminal investigations or other criminal proceedings when requested to do so by the President Judge of a Court. None of these powers appear to be in issue here."

In the light of these repeated declarations and reiterations by this Court of the well settled law of Pennsylvania, it is incomprehensible that a District Attorney or anyone can contend that an Attorney General has no power, apart from a statute, to ever supersede a District Attorney.

What happens to the public interest safety and welfare, when for any reason whatsoever both a District Attorney and an Attorney General* are disqualified or fail to act promptly, impartially and adequately in the

---

* An Attorney General has heavy burdensome statewide duties to perform, including daily requests from the Governor or members of his cabinet or members of the legislature or members of commissions for an interpretation of Statutes and their powers and duties thereunder. For these reasons it is difficult and ofttimes impossible for him to be a watchdog over all the acts of 67 District Attorneys in 67 separate counties in the State. Furthermore, he may be disqualified because of personal or professional interests, or for any of the reasons hereinbefore set forth for the disqualification of a District Attorney.

circumstances? Are the people of that County to be left unprotected? To answer "yes" would be ridiculous. Yet unless the Courts have inherent power—under those unusual circumstances—to appoint special investigating and/or prosecuting attorneys, an entire law abiding community can be left without adequate protection and redress against crime and corruption. Can any person believe that Courts are so impotent and so oblivious of obvious public duty that they cannot and will not do whatever may be necessary to require a prompt and impartial investigation in order to protect the public?

Under Certain Circumstances *a Court Can Appoint Special* Investigating and/or Prosecuting Attorneys to Supersede a District Attorney

In *Commonwealth v. Brownmiller*, 141 Pa. Superior Ct. 107, where the Secretary of Highways was indicted and convicted of wilfully and corruptly using the funds of the Commonwealth for political purposes, the Superior Court granted the petition of the District Attorney for the *appointment by the Court* of additional assistant district attorneys for the preparation of the case. The Court said (pages 111-112) : *"the president judge* of the Court of Quarter Sessions of Dauphin County *appointed additional special assistants* to the district attorney . . . [and] also authorized the district attorney to engage, . . . stenographers, typists, a county detective, three investigators, a filing clerk, and a photostat operator.

. . .

"The courts under our Constitution have *certain inherent rights and powers* which do not depend solely upon express constitutional or legislative grants. They may do all things that are reasonably necessary for the administration of justice within the scope of their ju-

risdiction: 14 Am. Jur., Courts, §171. Judge MAXEY now Justice of the Supreme Court, recognized that rule when presiding in Lackawanna County in Re Surcharge of County Commissioners, 12 D. & C. 471. In an elaborate opinion which included a discussion of *inherent powers of the courts of record,* he held that it is within the scope of the court's jurisdiction to order the payment of the salary of an employee who was required by a judge to assist him in the administration of Justice, as that is within the court's inherent powers. See, also, Commonwealth v. Shaffer, 178 Pa. 409, 35 A. 924; Edwards v. Prutzman et al., 108 Pa. Superior Ct. 184, 165 A. 255; Lycoming County Commissioners v. Hall, 7 Watts 290; 15 C.J. §205, p. 871."

In *Commonwealth ex rel. Shumaker v. New York & Pennsylvania Company, Inc.,* 378 Pa. 359, 106 A. 2d 239, this Court said (page 369) : "We do not hold that because of the statutory coverage of such appointments *a court* is confined thereto and wholly without power to appoint an attorney to act as an assistant to the district attorney. Such inherent power has been recognized (see Commonwealth v. Brownmiller, 141 Pa. Superior Ct. 107, 14 A. 2d 907)."

In *Dauphin County Grand Jury Investigation Proceedings (No. 3),* 332 Pa., supra, where the Governor of Pennsylvania and several members of his cabinet were subjected to a special grand jury investigation, *this Court not only sustained the power of the Attorney General to supersede a District Attorney,* but *directed the lower Court to appoint an attorney-at-law to perform the duties of a district attorney in lieu of the Attorney General.* The Court said (page 367) : "The Attorney General is an appointee of the Governor and subject to dismissal by him. Under such circumstances ordinary sentiments and impulses would necessarily tend to interfere with the Attorney General's freedom of action, even though he might not in fact

succumb to the temptations which would confront him. To permit him to conduct the investigation in such a case would be contrary to all standards of professional ethics, as the Attorney General himself commendably recognizes, for, in the brief presented by him to this court, he disclaims any intention of handling the proceedings personally. In the event, therefore, that the court below shall decide that the district attorney has been properly superseded, *it will thereupon appoint an attorney at law resident in another county* to perform his functions." *How can such an obviously necessary inherent power be doubted?*

But we do not need to rely solely on necessity, or on the decisions of the Supreme Court of Pennsylvania and the Superior Court of Pennsylvania to support and justify this inherent power of a Court to maintain, promote and preserve Justice! The Supreme Court of the United States has recently once again *strikingly proclaimed the broad inherent rights and powers of a Court to protect the public interest* in *Baker v. Carr*, 369 U. S. 186. In that case the Supreme Court held that a Federal District Court had jurisdiction to consider and determine whether a citizen of Tennessee had been denied the equal protection of the law guaranteed by the Fourteenth Amendment, by reason of the failure of the General Assembly of Tennessee to reapportion the State's 95 Counties and particularly the County in which the complainants resided. Many decisions of the Federal District Courts have held that a Court has inherent power to void a reapportionment legislative act and to direct an election at large of Congressional and State representatives or to order such an election if the Legislature does not validly and constitutionally promptly reapportion the Districts and Counties in the State. It is clear, therefore, that whenever reasonably necessary for the protection of Constitutional rights or the preservation of Justice, a Court having general ju-

risdiction of the subject matter has the *inherent* right and power to order and direct all things that are reasonably necessary for the protection of the people and the preservation of Justice.

The majority have, in my judgment, not only made a major mistake in holding that the Courts have no inherent power ever to supersede a District Attorney,* but have also made another mistake.

There is absolutely no merit in the contention that Crumlish has been removed (or ousted) from the office of District Attorney. The majority assert that no court may remove a District Attorney except in accordance with a statute, and the following language from *Snyder's Case*, 301 Pa. 276, 288, 152 A. 33, is quoted to support their contention: "Where the Constitution or statute points out a method for the *removal* of a public officer, that is exclusive of other methods: . . ." Apart from the extraordinary circumstances which exist in this case and which justify supersession of the District Attorney** by Court appointed

---

* Supersession by a Court of Quarter Sessions, like supersession by the Attorney General, is, we repeat, of course subject to review in this Court where the test is an abuse of discretion and/or error of law.

** The Quarter Sessions Court did not have to hear testimony to determine the truth of the averments by the District Attorney that he was ready, able and willing to conduct a proper investigation. In this case, the District Attorney's *failure* to promptly investigate the allegations of sale of legislation by City Council, and the alleged widespread graft, corruption and crimes by important officials in the City administration, and by members of the Democratic City Committee, was so glaring, and his dereliction of duty in this respect was a matter of common and widespread knowledge in Philadelphia, that under these circumstances his supersession by Order of the Quarter Sessions Court was thoroughly and unquestionably justified. Furthermore, the Leonard petition was, according to the majority, not an adversary proceeding and consequently only the averments of the petition and matters of common knowledge in Philadelphia can properly be considered.

investigators and prosecutors, it is an indisputable fact that *Crumlish has not been removed* or displaced as District Attorney of Philadelphia County.

Crumlish is still District Attorney of Philadelphia County and he still has all the powers—except for conducting this one investigation—of a District Attorney, and he still has his salary as District Attorney. Furthermore, he still has voluminous duties to perform. For example, he and his staff have to prepare approximately 1,800 indictments *every month,* interview witnesses in connection therewith and present them and other evidence to the regular *monthly* grand jury. Crumlish, with the aid of his staff, still has to try several hundred criminal cases *every month,* and Crumlish has the further important duty of disposing of or substantially reducing the constantly increasing *backlog of criminal indictments* which now total over 17,000.

### Appeal of D'Ortona

The last questions worthy of discussion are raised by the Appeal of D'Ortona et al. from the order of the Quarter Sessions Court made by Judge ALESSANDRONI who, without notice to the City Solicitor, enjoined, for a period of three days, a hearing by a committee of City Council of its charges against Griffin. One or more City Councilmen publicly charged that Griffin was disqualified to act as an Assistant Special Counsel to investigate members of City Council because of his alleged bias.

Griffin's petition to the Quarter Session Judge ALESSANDRONI for an order restraining City Council from conducting an investigation of him alleged, inter alia, that such investigation was illegal and unconstitutional. Each side contends that the actions of the other side were illegal and violated one or more provisions of the Constitution. It has been the history of our Country that similar questions have been raised—

particularly in Washington—one or more times a year for a century, i.e., (a) questions involving the right of a legislative body to investigate and cross-examine witnesses, and (b) questions involving the alleged encroachment by one branch upon another branch of the Government, and the alleged usurpation of powers and jurisdiction by the Executive or by the Legislature or by the Courts.

The genius and success of our Constitution—which has been aptly described by distinguished British Prime Ministers* and distinguished Americans** as the greatest document ever written—is that our Government, with its system of checks and balances, is divided into three great branches or divisions of Government which are co-ordinate and co-equal—the Executive, the Legislative, and the Judicial. It has been found impossible to draw a line which clearly and sharply divides these great divisions of Government, and necessarily there may be from time to time an overlapping or a concurrent jurisdiction.*** Furthermore, there have been and often will be borderline cases and each of these must be decided on its own particular facts.****

The instant case is not a borderline case. It is clear that Courts have the right and power to issue temporary restraining Orders *without notice, in order to preserve the status quo or to protect the Orders which they have made*—even when the Court's jurisdiction is challenged: *United States v. United Mine Workers of America,* 330 U. S. 258, 266, 290; *United States v. Shipp,* 203 U. S. 563, 573. Moreover, the scope of this Court's review in the Appeal of D'Ortona et al. is limited to

---

* William Pitt, William E. Gladstone; also Lord Bryce.

** Among them, Alfred E. Smith.

*** See, for example: *Dauphin County Grand Jury Investigation Proceedings (No. 2),* 332 Pa. 342, 355-356, 358.          ,

**** See, for example: *McGinley v. Scott,* 401 Pa. 310, 164 A. 2d 424.

deciding whether there was any reasonable ground for the temporary restraining order of the Quarter Sessions Court: Cf. *Slott v. Plastic Fabricators, Inc.*, and cases cited therein, 402 Pa. 433, 167 A. 2d 306; *Lindenfelser v. Lindenfelser*, 385 Pa. 342, 123 A. 2d 626. Whether considered in the light of Council's Resolution, or considered in conjunction with that Resolution and all the surrounding circumstances, the Court's temporary restraining Order was undoubtedly supported by reasonable grounds; it was not an abuse of discretion; indeed it was imperative.

This Court is unanimously of the opinion that Council's Resolution set forth no proper or legitimate legislative purpose and was therefore invalid.